788 P.2d 1293

**Sally COSGROVE, By and Through her guardian ad litem, Linda WINFREE; and Linda Winfree, individually, Plaintiffs-appellants,**

v.

**MERRELL DOW PHARMACEUTICALS, INC., Defendant-respondent.**

No. 17451.

Supreme Court of Idaho.

June 8, 1989.

On Rehearing March 29, 1990.

Imhoff & Lynch, Boise, Harney, Wolfe, Pagliuso, Shaller & Carr, Los Angeles, Cal., for plaintiffs-appellants. David H. Harney and Michael W. Moore, Boise, argued.

Quane, Smith, Howard & Hull, Boise, Dickson, Carlson & Campillo, Santa Monica, Cal., for defendant-respondent. Robert Dato and Jeffrey Carlson, argued.

BAKES, Chief Justice.

Plaintiffs Linda Winfree and her daughter, Sally Cosgrove, sued defendant Merrell Dow Pharmaceuticals, Inc. (Merrell Dow), for birth defects suffered by Cosgrove, allegedly as a result of Winfree's ingestion of the "anti-morning sickness" drug, Bendectin, during her pregnancy. This is one of a series of Bendectin cases filed nationwide. Summary judgment was granted for defendant on Winfree's individual claims because the I.C. § 5–219(4) 2–year statute of limitations had run. The claims of infant Cosgrove, however, were not barred by the statute of limitations, and those claims continued to trial. The jury returned a unanimous special verdict for defendant Merrell Dow, finding that Bendectin was not the proximate cause of Cosgrove's birth defects. Judgment was entered accordingly and plaintiffs appeal. We affirm.

I

Plaintiff Linda Cosgrove Winfree (Winfree) conceived plaintiff Sally Cosgrove (Sally) on approximately March 24, 1975. Early in her pregnancy Winfree began experiencing nausea and vomiting. While on a family vacation in California, on April 17, 1975, Winfree was seen at the St. Francis Hospital emergency room in Santa Barbara, and she obtained a prescription for Bendectin there. Winfree subsequently ingested Bendectin to treat her morning sickness. Sally was born on December 17, 1975, missing her left forearm and hand. It is alleged that Winfree's ingestion of Bendectin was the cause of Sally's birth defects. Bendectin was manufactured and distributed on the American market by defendant Merrell Dow from 1956 until June 9, 1983, on which date its production was suspended worldwide.

Plaintiffs initiated this action on September 13, 1983, seeking both compensatory and punitive damages. Defendant Merrell Dow answered and, after extensive discovery, moved for summary judgment on

Winfree's individual claims. The court granted the motion because Winfree's claim was time barred under I.C. § 5–219(4). Just prior to trial the court dismissed all of the "Doe" defendants, at which time defendant Merrell Dow removed the case to federal court, based upon diversity of citizenship. Ultimately, the case was remanded to state court. Trial commenced on February 2, 1988, and took approximately five weeks. On March 10, 1988, the jury returned a unanimous special verdict in favor of defendant Merrell Dow, finding that Bendectin was not the proximate cause of Sally Cosgrove's injuries. Judgment was entered on both plaintiffs' claims on March 22, 1988. Plaintiffs appeal.

II

Appellants raise numerous issues on appeal. Most of the issues concern the admission or rejection of evidence, much of it offered through expert witnesses. Accordingly, we preface our analysis by reviewing the discretionary authority granted to trial judges regarding rulings on the admission of evidence. The applicable law was recently set out in *Soria v. Sierra Pacific Airlines, Inc.*, 111 Idaho 594, 606, 726 P.2d 706, 718 (1986):

Idaho grants trial judges *"broad* discretion as to the admission of evidence and the exercise of that discretion will not be overturned absent the *clear showing* of abuse. *Cheney v. Palos Verdes Investment Corp.*, 104 Idaho 897, 900, 665 P.2d 661, 664 (1983). (Citations omitted) (emphasis added.) Trial judges also are granted *broad discretion* in determining relevancy." [Citations omitted.]

The trial court's broad discretion particularly applies to the admission of expert testimony, *IHC Hospitals, Inc. v. Board of Comm'rs*, 108 Idaho 136, 697 P.2d 1150 (1985), and that discretion will not be disturbed on appeal absent a showing of abuse:

Admissibility of expert opinion testimony is discretionary with the trial court and will not be disturbed absent a showing of an abuse of discretion.

*Stoddard v. Nelson*, 99 Idaho 293, 297, 581 P.2d 339, 343 (1978).

With the applicable standard of review in mind, we begin by discussing four evidentiary issues concerning (1) excluding evidence of warnings on other products; (2) precluding evidence of advertisements which allegedly proved over-promotion; (3) precluding evidence that Merrell Dow had removed Bendectin from the market; and (4) evidence of habit. Preliminarily, we note that each of these issues were rendered essentially moot by the unanimous jury verdict which found that the drug Bendectin was not the proximate cause of the plaintiff Cosgrove's birth defects. The excluded evidence was directed to issues which the jury did not reach because of its express finding that Bendectin was not the proximate cause of plaintiff's birth defects. Therefore, even if the trial court's rulings had been erroneous, they would have been harmless error. Nevertheless, we will review each of the trial court's rulings on these evidentiary matters.

■ First, the trial court did not err when it precluded the introduction of testimony regarding other Merrell Dow drugs, MER/29 and Thalidomide, which plaintiff claimed arguably showed a habit of fraud, falsification of scientific data, and a general pattern of deceit as to the FDA and the consuming public. The trial court rejected the claim of a general pattern and found that the proffered evidence was not sufficiently probative and did not bear "any relevance to any issue properly before the court and jury in this case." Trial judges are granted broad discretion in determining relevancy, and on this record we can find no clear abuse of discretion in her ruling regarding the probative value and the relevancy of that evidence.

■ Next, the trial court did not err in precluding plaintiffs from mentioning the fact that Bendectin was no longer available on the market after Merrell Dow ceased production of it. The fact that Merrell Dow ceased the production of Bendectin did not tend to prove a fact at issue in the trial more or less probable. I.R.E. 407 precludes the introduction of post-event

conduct to prove negligence. As I.R.E. 407 states, "Whenever, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event."

Third, the trial court did not err in allegedly precluding the use of advertisements and the testimony of Merrell Dow's salesmen to prove over-promotion of Bendectin in support of plaintiffs' claim that Merrell Dow negligently failed to warn of the possible consequences of taking Bendectin. Plaintiff argued that evidence of over-promotion was admissible in support of its claims of strict liability and negligence. We need not resolve the issue of whether evidence of over-promotion of a drug is relevant evidence in proving claims of strict liability or of negligently failing to warn of the dangers in the drug. Contrary to appellants' allegations, we note that Plaintiffs' Exhibit 102C (Merrell Dow advertisement for Bendectin) was admitted, and that the advertisement was used by two of plaintiffs' witnesses; it was also used to cross examine Dr. Goddard, an expert witness for the defense. We find no clear error in the trial court's handling of this issue. Furthermore, the jury's finding that Bendectin did not cause plaintiff's birth defects renders this issue moot.

Finally, the trial court did not err in allegedly excluding evidence of warnings on products other than Bendectin which contained one of the same active ingredients as did Bendectin. The trial court did allow plaintiffs' counsel to introduce evidence of some other warnings, including that on Bonadoxin, which was read at length into the record immediately before the Bendectin warnings were read. There is no showing of clear error in the trial court's exercise of discretion on this issue. Again, the jury's unanimous finding of no proximate causation renders this and the other previous issues moot. We affirm the trial court's actions on these evidentiary matters.

### III

■ Appellants also contest the trial court's decision to preclude the taking of depositions of various employees, officers, past employees and past officers of the defendant Merrell Dow. Appellants were not allowed to take their depositions because appellants made no showing of a need for information that was not already contained in the federal multi-district Bendectin litigation entitled, *In re Richardson–Merrell, Inc., "Bendectin" Products Liability Litigation,* 624 F.Supp. 1212 (S.D.Ohio 1985), *aff'd in part, and vacated and remanded in part,* 857 F.2d 290 (6th Cir.1988), *cert. denied,* 488 U.S. 1006, 109 S.Ct. 788, 102 L.Ed.2d 779, 57 U.S.L.W. 3452 (1989). All materials generated in the federal multi-district litigation were available to appellants for a reasonable charge.

The trial court's order was effective only as to particular depositions; it did not affect appellants' interrogatories or motions for production of documents. In her protective order, the trial judge stated:

The depositions taken in [the federal multi-district litigation] cover the areas which the plaintiffs now seek to enter. At oral argument on the Motion for Protective Order, this court repeatedly asked plaintiffs' counsel what information was sought that was not already contained in the depositions which have already been taken in the multi-district litigation. Counsel's only response was the vague statement that they would like to approach the case in their own way. ... The plaintiffs are entitled to obtain discovery of all relevant evidence and of all evidence which may lead to relevant evidence. However, the depositions taken already accomplish that purpose. ... If more specific information is provided to the court showing that there are areas which have not previously been the subject of discovery, the court would permit discovery into those matters.

Under I.R.C.P. 26(c), the trial court was well within its authority to so limit appellants' discovery efforts. No showing of a need for more specific information was ever made. Neither have appellants dem-

onstrated prejudice resulting from the trial court's order. Accordingly, we conclude that the trial court's order constituted a proper exercise of discretion under I.R.C.P. 26(c) and we affirm.

## IV

■ Appellants next contend that the trial court erred in granting Merrell Dow's motion for summary judgment on Winfree's individual cause of action. Appellants contend that *Allen v. A.H. Robins Co., Inc.*, 752 F.2d 1365 (9th Cir.1985), is on point and mandates that Winfree's cause of action accrued when she knew of, or reasonably should have been put on inquiry regarding, her damages. *Allen*, however, is inapposite. The court in *Allen* found evidence of fraudulent concealment of the damage to plaintiff which, under I.C. § 5–219(4), would have prevented the statute of limitations from running. Accordingly, the *Allen* court held that summary judgment was improperly issued because there was a factual issue regarding fraudulent concealment of damage. The trial court here, however, found no evidence of fraudulent concealment on the part of Merrell Dow, nor do we.

Under I.C. § 5–219(4), a cause of action is deemed to "accrue" at the time of the occurrence, act or omission complained of. However, in interpreting that statute, this Court held in *Stephens v. Stearns*, 106 Idaho 249, 254, 678 P.2d 41, 46 (1984), and *Blake v. Cruz*, 108 Idaho 253, 260, 698 P.2d 315, 322 (1985), that "the statute of limitations does not begin to run against a negligence action until some damage has occurred." In *Blake v. Cruz*, this Court held, in another birth defect case, that the fact of damage in a wrongful birth/defective birth arises when the defective child is born. In this case, Cosgrove was born on December 17, 1975, with the defective hand and arm. Her mother, plaintiff Winfree, began to incur medical expenses shortly thereafter in 1976. As held in *Blake*, "some damage has occurred" at the time of the defective birth and immediately thereafter as Winfree began to incur medical expenses. However, Winfree did not file her action until 1983, almost seven years after the birth of Sally Cosgrove with the defective hand and arm. The two-year statute of limitations in I.C. § 5–219(4) had long since run. Accordingly, the trial court did not err in dismissing plaintiff Winfree's complaint.

Appellants claim nevertheless that Winfree did not "discover" the cause of Cosgrove's birth defect until 1983. There is, however, no "discovery" exception in Idaho except for the leaving of foreign objects in the body. I.C. § 5–219(4); *Davis v. Moran*, 112 Idaho 703, 735 P.2d 1014 (1987); *Wing v. Martin*, 107 Idaho 267, 688 P.2d 1172 (1984).

## V

■ Appellants contend that the trial court erred in excluding drug experience reports (DER's) regarding congenital malformations insofar as those reports could be used to establish, in part, the capability of Bendectin to cause limb defects in human beings. DER's are submitted to drug companies primarily by practicing doctors, but also by researchers, patients, lawyers, and other interested persons. DER's report individual patients' post-ingestion experiences with particular drugs. The record contains expert testimony that the experiences related in the reports are anecdotal in nature and should not form the basis for any conclusions, expert or otherwise. Under this scenario, and in the exercise of the discretion recognized in *Soria v. Sierra Pacific Airlines, Inc.*, 111 Idaho 594, 726 P.2d 706 (1986), the trial court limited the use of the DER's to the issue of notice.

Appellants essentially claim that the DER's should have been admitted for the truth of the matters asserted in them. The observations and information contained in DER's are clearly hearsay, however, and appellants have not asserted or come within any exception to I.R.E. 802, the hearsay rule, which would allow their admission to prove that Bendectin was either defective or the cause of Cosgrove's birth defect. Accordingly, we see no clear abuse of discretion in the trial court's refusing their

admission, for the truth of the matters contained therein, because of their unreliable hearsay nature.

## VI

■ Appellants contend that the trial court erred in permitting Merrell Dow's expert witnesses, Goddard and Lamm, to testify relying upon illustrative exhibits which allegedly were based upon unreliable hearsay. Merrell Dow used two basic types of sales charts as exhibits at trial. The first was based upon new therapy starts, while the second was based on the total number of Bendectin tablets distributed. These charts demonstrated that the level of birth defects remained relatively constant through the period of time in which Bendectin sales initially rose and then declined to zero. In analyzing both limb defects and limb reduction defects, the charts demonstrated that there was no relationship between Bendectin sales and birth defects. The witnesses explained that the sales charts were based on data that was either relied upon on a daily basis by the pharmaceutical industry, or was required to be submitted to the Food & Drug Administration (FDA). The trial court concluded that the nature of the data itself guaranteed its trustworthiness, and that the exhibits should be admitted.

The charts are admissible under any of three exceptions to the hearsay rule. The first is the business records exception, I.R.E. 803(6). Under the business records exception, both the new therapy starts chart and the tablets distributed chart were derived from data compiled in the regular course of Merrell Dow's business. The exhibits were also admissible under a second exception to the hearsay rule, the public records exception, I.R.E. 803(8). Under the public records exception, "matters observed pursuant to duty imposed by law and as to which there was a duty to report" are admissible. I.R.E. 803(8). The FDA required Merrell Dow to submit data showing the number of Bendectin tablets distributed. The tablets distributed data was then compared with birth defect data obtained from the Centers for Disease Con-

trol (CDC). Numerous cases have held that CDC data is admissible under the public records exception, *see, e.g., Ellis v. International Playtex, Inc.,* 745 F.2d 292 (4th Cir.1984), and *Kehm v. Proctor & Gamble Mfg. Co.,* 724 F.2d 613 (8th Cir. 1983). The exhibits were also admissible under a third exception to the hearsay rule, the market reports exception, I.R.E. 803(17). The exhibits which showed new therapy starts were derived from data compiled by independent sources and then sold to various pharmaceutical manufacturers. This is a classic example of a market report, and the charts would properly have been admitted under this hearsay exception. Appellants failed to convince the trial court that the evidence was either misleading or untrustworthy; therefore, the trial court did not err in admitting the exhibits and permitting the jury to determine how much weight should be given them. Accordingly, we conclude that the Idaho Rules of Evidence provided ample exceptions to the hearsay rule to allow the admission of Merrell Dow's charts.

## VII

■ Appellants next contend that the trial court erred in refusing to admit the tax returns of Dr. Harbison, an expert witness for Merrell Dow, to show his alleged bias, prejudice, and perjury. On cross examination, plaintiffs attempted to show that Dr. Harbison had earned far more from testifying in court than the figure he initially testified to. They attempted to prove his alleged perjury by offering into evidence Dr. Harbison's income tax returns. Dr. Harbison's tax returns listed a substantial income from private consulting, but did not show how much was from testifying in court. After allowing plaintiffs' counsel considerable latitude in attempting to impeach the witness, and after overruling a number of defendant's objections, the trial judge observed:

[S]ome inquiry into this area is always proper with expert witnesses of either side, and it's information customarily provided to the jury, but this is being done in such a confusing form, that I

think we are consuming too much time with it.

I also think it's been addressed and the witness has said he doesn't know the answer [how much was from testifying in court]. If you have something you want to show him to refresh his recollection, go ahead.

Plaintiffs attempted to refresh Dr. Harbison's recollection by showing him copies of his tax returns for the years 1982–1986. Subsequently, the jury was excused, and an exchange among counsel, the court, and Dr. Harbison ensued. Defendant moved for a mistrial, but the motion was denied. Ultimately the court asked plaintiffs' counsel to form a question specifically aimed at asking how much Dr. Harbison earned from testifying in court. Plaintiffs' counsel was unable to formulate a proper question, and the trial judge was forced to intervene and ask the question herself, to which Dr. Harbison answered, "around $10,000, maybe 15,000 per year."

The entire issue was reargued the next court day. The court then reviewed all of Dr. Harbison's testimony again and, in still a third hearing, the court found that plaintiff's method of cross examination was "extremely confusing"; nevertheless, the cross examination testimony was allowed to stand. However, the court held that the tax returns themselves were not admissible:

I reviewed all the testimony. And it is my conclusion that the tax returns do not impeach the witness's earlier testimony.... [I]t's my basic view that the tax returns are extrinsic, since they don't impeach him.... They are thus cumulative, and evolved into a situation that was unnecessarily time consuming. ... [I]n this case the fact that experts are getting paid has almost a nil effect, because everyone has had to do it, and he wouldn't testify he didn't. So over all, I just don't think it was prejudicial.

The scope of cross examination rests in the court's discretion. *Quick v. Crane*, 111 Idaho 759, 727 P.2d 1187 (1986); *State v. Wheeler*, 109 Idaho 795, 711 P.2d 741 (Ct. App.1985). The refusal of the trial court to admit the tax returns as impeachment evidence was based upon the trial court's determination that the tax returns did "not impeach the witness's earlier testimony." On such evidentiary rulings, we defer to the discretion of the trial court unless a clear showing of abuse is made. *Soria v. Sierra Pacific Airlines, Inc.*, 111 Idaho 594, 726 P.2d 706 (1986). On this record we cannot find an abuse of that discretion, nor have appellants shown that their case was prejudiced. *State v. Wheeler*, 109 Idaho 795, 711 P.2d 741 (Ct.App.1985). Accordingly, we affirm the trial court's handling of the matter.

### VIII

Appellants contend that the trial court erred because it arranged the interrogatories on the special verdict form in such a way as to invite a quick and non-deliberative verdict by placing the issue of proximate causation first. Question number 1 on the special verdict form reads as follows:

QUESTION NO. 1: Was Bendectin the proximate cause of the plaintiffs' injuries and any resulting damages?

Yes _____ No _X_

If your answer to Question No. 1 is "no", please sign the verdict form. Do not answer any other questions. If your answer is "yes", please answer the next question.

Plaintiffs' complaint alleged claims both in strict liability for a defective product, and negligence on the part of Merrell Dow. These claims, together with the claim that the product was the proximate cause of the plaintiffs' injuries, were all issues submitted to the jury by appropriate instructions. Of necessity, one of those three issues had to be presented first on the special verdict form. It was hardly an abuse of discretion on the part of the trial court to submit the question of proximate cause to the jury first, since if they found that the product did not cause the appellants' injuries, then the jury would not have to struggle with the other complex scientific issues of whether the product was

defective and unreasonably dangerous, or whether Merrell Dow was guilty of negligence. There was no showing that the special verdict form confused the jury, and the jury was correctly instructed on the definition of proximate cause in an instruction patterned after IDJI 230. Accordingly, we conclude that the trial court did not err in arranging the order of the questions on the special jury verdict form.[1]

## IX

■ Appellants contend that the trial court erred in excluding Plaintiffs' Exhibit No. 237 from evidence. Exhibit 237 purported to summarize 106 studies that had been done on Bendectin, and upon which Dr. Done, plaintiffs' expert witness, based his expert opinion that Bendectin caused Sally's birth defect. Appellants contend that the 90% confidence level methodology utilized by Dr. Done in assembling Exhibit 237 is generally accepted in the scientific community, but that the trial court rejected the exhibit because a 95% confidence level was not used.

Appellants' argument, however, misstates the basis of the trial court's ruling. Exhibit 237 was *not* excluded for failing to meet a 95% statistical confidence level. Rather, the court found numerous other fundamental problems rendering the exhibit inadmissible. The problems the trial court noted include the following: (1) Exhibit 237 relied on evidence previously ruled inadmissible; (2) the exhibit utilized investigations not involving Bendectin; and (3) the 106 studies purportedly underlying the exhibit were in reality 50 studies which had been restructured by Dr. Done to appear as though 106 separate studies had been performed. The trial court concluded that, as presented, the exhibit was confusing and misleading, and its admission would result in time consumption that was not justified by its utility to the jury.

Additionally, the court's final ruling came only after this issue was addressed by counsel, and ruled on by the trial court, at two separate junctures during the trial. When the issue was first raised, the trial court heard the arguments of counsel, took a recess, and then returned to state:

THE COURT: I have given the matter considerable thought. The purpose of all expert testimony is to be helpful to the jury in resolving the issues before it. The proposed exhibit is all I'm going to address, proposed Exhibit 237.

Proposed Exhibit 237 relies upon evidence that I previously ruled is inadmissible in evaluating whether or not the drug Bendectin causes birth defects.

Specifically, I have previously ruled that D.E.R.'s are not relevant to be considered for that purpose. The exhibit refers to investigations not involving Bendectin, although I realize that the assertion is that it involves drugs of that class.

---

1. Appellants may well have no standing to assert this issue as an error on appeal. The following discussion between the court and counsel took place near the close of trial:

    Mr. Carlson [defense counsel]: The remaining matter, Your Honor, would be the special verdict. Our proposal to eliminate juror confusion with the special verdict is to begin with the question, simple question, whether or not Bendectin caused the plaintiff Sally Crosgrove's birth defect.
    The Court: I like your suggestion on that and it is being revised, I think that is a good idea.
    Mr. Carlson: Okay.
    Mr. Tate [plaintiffs' counsel]: We accepted that, Your Honor.
    Appellants cannot assert error in the special verdict form when their counsel approved it at trial, even if the issue is somehow properly preserved for appeal. In their reply brief, appellants assert that the transcript is inaccurate, and argue that what Mr. Tate actually said was, "We excepted to that, Your Honor." Attached to Appellants' Reply Brief is a copy of a letter from counsel to the court reporter requesting that the transcript be corrected to reflect that change. However, the court reporter made no change in the transcript, and no objection to the transcript was filed with the court within the 21–day time period provided by Idaho Appellate Rule 29, which would have permitted the trial court to resolve the question of whether the appellants did or did not "accept" the form of the special verdict, based upon the trial court's personal recollection of the statements by counsel at the jury instruction conference. Appellants did file an Objection to Clerk's Transcript on Appeal on July 13, 1988, but their objections dealt with matters other than the transcript correction at issue here. Accordingly, we must rely on the transcript as submitted to this Court.

I do not think, however, that that is sufficient. I think that the exhibit will tend to confuse the issues. It is not sufficiently helpful and does not have the necessary basis for admissibility in this case.

The trial continued and following the noon recess plaintiffs' counsel pressed the issue again. Further argument was heard, and at the conclusion of that argument the trial court stated:

It's not clear to me that this [Exhibit 237] fairly summarizes the information that it is supposed to be summarizing. I have no way of independently addressing any of this....

Now, I understand what this graphic technique is and that is not the issue that I am concerned about. But this approach of going to studies, studies that individually one wouldn't rely upon. And in summarizing it in this fashion, is certainly something I'm not familiar with. And secondly, it's not something for which the proper foundation has been laid.

....

THE COURT: ... The issue is, this is a summary of studies not in evidence. Now, the—and it's my memory, and I will check it, that the witness has not laid a foundation, that counsel just referred to, and that is the foundation that the court requires and that foundation has not been laid.

Each time that the question has been asked, the witness has tracked off into some other response and has not directly answered that question. That is the response that is needed.

A recess was again taken, after which additional argument was, for the final time, had before the court. At the end of the argument, and after the trial judge had questioned the witness herself, the trial judge made this final explanation and ruling:

THE COURT: ....

Obviously, a foundation has to be laid for the admissibility of the data used in the chart. That hasn't been done in court. It's obviously not stipulated to.

And I don't see how the fact that it has been reduced to a chart can get us over the point that evidence to be admissible in court has to be referring to either documents which are in evidence or in the case of studies of those reasonably relied upon by experts in the field.

I don't think it's necessary that the witness be an epidemiologist, but I do think that it's absolutely essential that the basic legal requirements of a foundation be laid before a document is introduced.

Now, there is nothing that I have addressed that says that Dr. Done can't give an opinion about the matters about which he has already testified.

He has already offered testimony expressing his view that Bendectin is a teratogen. There is nothing wrong with that. [By this time Dr. Done had also expressed his expert opinion that Bendectin caused Sally's birth defect.]

What we are addressing at this point is solely Exhibit No. 237, which foundation has not been laid, so I'm going to sustain the objection and we will proceed.

Exhibit 237 was offered to illustrate Dr. Done's testimony, yet no foundation was laid explaining what the exhibit portrayed. Neither were the studies purportedly underlying the exhibit in evidence. Exhibit 237 contained information that had already been ruled inadmissible. Further, the trial court found it to be confusing and misleading. The exhibit restructured 50 studies (defendant claims that the number is closer to 30) and made it appear as though 106 separate data sets had been independently accumulated. The record amply supports the trial court's conclusion that the exhibit was confusing and misleading.[2] Further-

2. Even on appeal counsel for appellants, at oral argument, was not able to explain what Exhibit 237 portrayed. When asked specific questions relative to Exhibit 237, Mr. Harney replied, "I cannot represent, Your Honor, what that [the intent of the apparent sweep line to the right] is." Additionally, when asked specifically regarding Line 92, Mr. Harney responded, "Again, Your Honor, I cannot represent why. This was constructed by Dr. Done who read all of the studies. I did not. I relied upon Dr. Done and his expertise." Finally, the court asked, "Did

more, even though the trial court refused the admission of Plaintiffs' Exhibit 237, Dr. Done was allowed to express his expert opinion that Bendectin is a teratogen and that it was the cause of Sally's birth defect. Plaintiffs' case, therefore, was not prejudiced by the non-admission of the exhibit. The trial court's refusal to admit Exhibit 237 was not error.

### X

Appellants next contend that the trial court erred in permitting Dr. Done to be cross examined regarding findings made by a District of Columbia trial judge in the case of *Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, D.C.Superior Ct. No. 1245–82 (February 11, 1988). In *Oxendine,* the trial judge found that Dr. Done had perjured his testimony in certain respects. Accordingly, during the course of cross examination in the instant case, defense counsel attempted to elicit from Dr. Done the findings made in the *Oxendine* case.

Contrary to appellants' assertions, however, defense counsel was not allowed to cross examine Dr. Done regarding the *Oxendine* court's findings of perjury. Without exception, each time defense counsel attempted to explore the perjury charges, the objection of plaintiffs' counsel was sustained. Further, at no time during the cross examination did plaintiffs' counsel request the court to admonish the jury regarding defendant's cross examination of Dr. Done; nor did plaintiffs' counsel request the court to instruct defense counsel to cease further inquiries and move to another area of inquiry. In fact, at one point during the cross examination, defense counsel specifically asked the court, "May I inquire further in this area, Your Honor?" The court responded, "Ask your next question. I have sustained the objection [to an earlier attempt to impeach Dr. Done]."

The record clearly shows that the trial court did not permit defense counsel to cross examine Dr. Done regarding the trial court's perjury findings in the *Oxendine* case. Accordingly, appellants' contention is without merit.

### XI

█ Appellants contend that the trial court violated appellants' due process rights when it, on the day following the jury verdict in this case, issued an order prohibiting the jurors from discussing the case with counsel. Appellants argue that this order prohibited them from determining whether post trial misconduct was committed by the judge, the jury, or opposing counsel. The record before us demonstrates that appellants' claims are without foundation.

The record reflects the following factual scenario. On March 10, 1988, after the jury had rendered its verdict and the decision was announced in open court, defense counsel asked the court if it was permissible to speak to the jury after court was adjourned. Judge Bail replied, "Well, we will discuss it. It is their decision." The judge and jury, along with the bailiff and court clerk, then retired to an empty courtroom to discuss, *inter alia,* defense counsel's request to interview the jurors themselves. Defense counsel waited outside this courtroom, but plaintiffs' counsel apparently left the area. When Judge Bail finished meeting with the jury, she left the courtroom. The bailiff then indicated that the jurors wanted to speak with the attorneys, so defense counsel entered the courtroom and began conversing with the jury. A short time later, counsel for plaintiffs arrived and entered the courtroom, and the jury/counsel colloquy continued for a little while longer. Later that evening plaintiffs' counsel contacted at least two jurors. One juror then called Judge Bail and complained about the contact. As Judge Bail stated:

He expressed very serious concern to me that the plaintiffs' counsel was manipu-

you establish any foundation as to the questions I just asked you about item number 92?" Mr. Harney answered, "Only in general. I didn't, as I recall, pick out item number 92 and say why do we have that formation at that particular

point? ... I can't answer that question." From the appellants' argument on appeal we are even more convinced that the trial court was correct in concluding that Plaintiffs' Exhibit 237 was confusing and misleading.

lating him and twisting his remarks. He expressed grave concern about what was going on, grave concern about whether or not other jurors might be harassed....

On this basis, Judge Bail issued an order instructing the jurors not to discuss the case with the attorneys until further notice. She stated "that I thought it might be wise, considering how charged up things were, to instruct the jury not to talk to anybody until further order from the court, since it seemed to me at that point some very unwise decisions were being made in terms of the contact with the jury." On March 14, 1988, plaintiffs filed a motion for relief from the order prohibiting juror contact, ostensibly to attempt to determine if there was any type of misconduct. The motion was denied on June 8, 1988.

The decision to limit juror contact rests in the sound discretion of the trial court. *See, e.g., State v. Beam,* 109 Idaho 616, 710 P.2d 526 (1985), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 704 (1986). A lawyer's contact with the jury after the jury's discharge must be accompanied by or following reasonable notice to the opposing counsel and other interested counsel. *Model Code of Professional Responsibility, DR 7–108(D) (1980); Umphrey v. Sprinkel,* 106 Idaho 700, 715, 682 P.2d 1247, 1262 (1983) (Bakes, J., dissenting). This rule guarantees the respective parties their basic right to be notified and have the opportunity to be present should any other party contact a juror, and, as the record shows, it was complied with in the instant case. At the end of the trial, and in open court, plaintiffs' counsel was put on notice that defense counsel wanted to contact the jury following adjournment. Plaintiffs' counsel had the same opportunity as defense counsel had to be present when defense counsel spoke with the jury. In fact, the record demonstrates that even though plaintiffs' counsel was not present initially, plaintiffs' counsel was present later during the post adjournment counsel/jury session. Additionally, given the conduct of plaintiffs' counsel later that evening in contact-

ing individual jurors, and given the jurors' reaction to that contact, we cannot find error in the trial court's decision to issue an order prohibiting further juror/counsel contact. We conclude that the trial court properly exercised its discretion, and we affirm its actions in this matter.

## XII

Respondent prays for attorney fees on appeal pursuant to I.R.C.P. 54(e)(1) and I.C. § 12–121, alleging that appellants have only attempted to find a more sympathetic trier of fact, and that there is no factual or legal substance to any of the issues raised by appellants in their attack on the jury's unanimous verdict. After reviewing the voluminous record, exhibits, transcripts, and briefs in this case, and after re-listening to the oral arguments presented by the parties on appeal, we are left with the abiding belief that the appeal was brought and pursued frivolously, unreasonably and without foundation. I.R.C.P. 54(e)(1). Accordingly, this Court awards attorney fees on appeal to respondent.

The judgment of the trial court is affirmed. Costs and attorney fees on appeal to respondent.

HUNTLEY and JOHNSON, JJ., concur.

SHEPARD, J.,* concurs, except for the award of attorney fees.

BISTLINE, Justice, dissenting.

Where there is not a federal question involved, this Supreme Court is the end of the line insofar as appellate review of trial court orders and judgments is concerned. In theory, because it is the end of the line, the composition of this Court is expected to represent an accumulation of trial experience and the knowledge which results from review of trial court rulings which should ensure that every civil litigant presenting his case to a jury receives at the very least a trial which has been fairly conducted. One of Justice Shepard's frequent observa-

---

* SHEPARD, J., sat and participated fully in the opinion prior to his untimely death.

tions was that no one is entitled to a perfect trial, but all are entitled to a fair trial.

Any concept of a fair trial includes the right of plaintiff or defendant to retain trial counsel of one's own choosing. From that point on the client of a necessity is dependent upon his chosen counsel to marshall the evidence and present it to the trier of fact, ordinarily a jury. The experience and wisdom of counsel weighs heavily in reaching determinations as to the mechanics of acquiring the evidence which is believed necessary in properly preparing the client's case for trial. Since Idaho's adoption of the "federal rules" of civil procedure, there has been considerably more pretrial discovery than was thought available under the prior code of civil procedure, primarily by the taking of depositions of adverse parties and their witnesses and by the serving of interrogatories, both of which may serve to pave the way for requesting admissions.

These discovery procedures were thought to remove from jury trials the element of surprise. There were abuses of discovery, particularly in regard to serving interrogatories which were unnecessarily multitudinous, vexatious, time consuming as to responses, and generally harassing. Much was written on the subject, not necessarily only an Idaho problem, but nationwide. Some alleviation of that exacerbating nuisance was achieved by court rules limiting interrogatories.

Regarding discovery depositions, too, there was some claim that there was unnecessary activity. It was generally the consensus of the legal profession that discovery was being used as a tool by which to grind down opponents who were not financially able to withstand the onslaught. Otherwise put, it was suggested that financially well-endowed parties, most often corporations, were at fault for abuse of discovery procedures, especially where defending against claims of ordinary citizens who were seeking redress in civil actions ordinarily sounding in tort.

Such legal indiscretions were in part curbed by court rules and legislation which provided that trial courts could enter protective orders.

Today this Court has before it, for the very first time insofar as available information discloses, a case where a child victim of an allegedly unsafe product has become also the victim of a judicially imposed protective order which precluded her trial counsel from preparing her case in advance of trial.

This Court has been asked to reverse the judgment entered below because of the trial judge's pretrial order precluding the taking of depositions of various employees, officers, past employees, and past officers of the defendant Merrell Dow Pharmaceutical, Inc. While many of the trial bar may not be critical of the trial judge's order because it is understandable that a single judge may be persuaded into committing error by enterprising counsel (for which reason there are appellate courts), the entire trial bar will be amazed that a five member appellate court (here, unfortunately reduced to four) upon mature reflection sees no error in the trial court's ruling, and in fact treats it as an open and shut case that the child-plaintiff's attorneys had no right to make their own decisions as to how they would go about marshalling the evidence in the preparation of their client's case. Justice Bakes speaks for the majority of three who so rule today.

As a generality, his opinion on this one issue is reduced to a single typewritten page, captioned Part III, one-half of which is a repetition of the trial judge's rationale for denying counsel the opportunity to marshall the necessary evidence for the plaintiffs' case. The essence of that monumental decision was the trial judge's own conclusion that, depositions taken in federal multi-district litigations, "already accomplish that purpose," referring to the judge's preceding remarks, "The plaintiffs are entitled to obtain discovery of all relevant evidence and of all evidence which may lead to relevant evidence."

Of course the plaintiffs are so entitled, but the discovery depositions in question were to be undertaken by the plaintiffs' attorneys—attorneys who are knowledge-

able and experienced in such matters of examining adverse witnesses. Just how the trial judge here could justify making the overly-broad statement that the depositions taken in Ohio have already accomplished the purpose of discovering all relevant evidence is unexplained by the judge, and also goes unexplained by Justice Bakes in writing for the two other justices neither of whom venture any clue.

Various possible explanations come to mind: (1) The trial judge here presiding knows the attorneys, on a personal or professional basis, who conducted that Ohio federal court litigation, and on that basis can assert that they would prove superior in examining capabilities as compared to Mr. Harney, Mr. McMahon of the California bar, Mr. Tate of the Pennsylvania bar, and Joe Imhoff, Michael Moore and Patrick Furey of the Idaho bar; or (2) The federal judge or judges presiding in the multi-district litigation tried in the Ohio federal district court, wisely would have supervised the depositions taken in that litigation in order to assure that the various plaintiffs were afforded thorough and exhaustive examinations of Merrell Dow Pharmaceutical, Inc.'s officers, personnel, experts, and other witnesses. Those are the best explanations which can be conjured, but both are ridiculous. Simply put, there is no explanation provided by either the trial judge or the majority of this Court, and there is no rational explanation which can be arrived at by surmise.

Every attorney who becomes involved to any extent in trial work knows that there are trial lawyers and then there are *trial lawyers,* meaning that there are always some who are better than the rest of us in conducting an examination of a witness, being of no moment whether it be a witness on the stand at trial, or a witness in a conference room giving a deposition. Even as among the best of the best there is always someone who on a given day in a given case can extract statements from a witness where others might fail, and, as applicable to this case may have already failed, meaning in the aforesaid Ohio multidistrict case. In northern Idaho we had our William S. Hawkins, our E.T. Knudson, our Harold Purdy, and from our neighbor to the west we had Del Carey Smith, Jr., Pete Tonkuff, James Connelly, Theodore "Ted" Petersen, just to mention a few, at the great risk of also forgetting a great many more. In southern Idaho there was Ben Doris, Ben Peterson, A.L. Merrill, Louis Racine, and many others who were skilled trial examiners.

Each one had his own style, and each was effective. As much as any of them may have enjoyed each other's company, it is much doubted that any of them would have been content to passively be stuck with an interrogation of witnesses made by one of the others. For certain each would not under any circumstance agree to buy a pig in a poke, which is exactly what served as the basis of the trial court ruling which we review today.

There is great merit in this statement from appellants' brief:

> We vehemently object to preclusion of our right to conduct discovery not only in our way pursuant to the Idaho Rules of Civil Procedure, but also to being bound by the competence, or lack thereof, or the strategies of other counsel ... We argued to no avail that due process and simple justice demanded that we be permitted to conduct the development of our case in a way which would be in Sally Cosgrove's interests and not be bound by a process of which we had any part!

To which I will ask that the trial bench take note that there is in Justice Bakes opinion, Part III, as now under discussion, *not one single citation of authority,* nay, not a single case mentioned, where another appellate court has upheld a ruling that a party defendant, or any party for that matter, is immune to discovery processes, especially where it was the plaintiff who would be putting up the ready cash which necessarily is attendant to the taking and transcribing of depositions. All that the intended witnesses needed to do was show up and receive witness fees, and testify, of course.

What the trial bench will make of this sad affair is that the trial judge and those in this Court who comprise the majority are

not being realistic as to happenings at depositions. Justice Bakes, in defending the trial judge, confines his explanation to two lines. First, after noting the district judge's remarks, "[T]his court repeatedly asked plaintiffs' counsel what information was sought that was not already contained in the depositions taken in the multi-district litigation," Justice Bakes adds, "No showing of a need for more specific information was ever made. Neither have appellants demonstrated prejudice resulting from the trial court's order."

If this is judicial rationale, it is asinine rationale as well, and if the point is not clear, it probably never will be. Nonetheless, it behooves me to point out to my usually astute brethren that most depositions are not taken to get specific information which one already possesses; depositions are taken to get information which one expects to obtain, by adroitly examining witnesses who have to answer (and many of whom may in fact want to answer in the interests of justice) and whose answers suggest further probing until, perhaps, lo and behold, the witness makes a statement supporting the case of one's client.

It is ludicrous for this august body to uphold an order precluding discovery because a judge has not been told "what information was sought that was not already contained in depositions" (of some other witness in some other case in some other state in some other court system by some other unknown attorneys).

Point: If one has knowledge of the "information," one probably doesn't need to take any deposition.

Point: Taking depositions is a discovery process.

Point: Discovery, in addition to being a good name for a space shuttle, also by Webster's New Collegiate Dictionary, is defined as "the act or process of discovering."

The plaintiff in this case, Sally Cosgrove, a child, may take little solace in one day fully being brought to understand that her attorneys simply ran into two wholly un-foreseeable stumbling blocks in trying to fulfill the guarantee of a fair trial.

Clearly there was monumental error in precluding counsel from developing the case which they endeavored to prosecute, and apparently at the expense of advancing costs, in an attempt to obtain some measure of damages for Sally Cosgrove by reason of her mother's ingestion of defendant's product, Bendectin. A majority of this Court say otherwise, and so be it. While it is Sally Cosgrove who bears the brunt of two strange and unexplained rulings by two Idaho courts, the damage done to the right of a fair jury trial is inestimable. It remains to be seen what new developments take place when corporate defendants complain that they are being harassed by penniless plaintiffs.

There is also some question concerning Part XI of the majority opinion, dealing with the post-verdict amalgamation of jurors, or some of them, with first the trial judge, and then with defense counsel for Merrell Dow, and, also perhaps with corporate personnel. It may or may not be of some moment. It may have been lack of someone in authority laying out a game plan as to informing the plaintiffs' counsel as to whether there would be a meeting. Justice Bakes provides one account, and his view is that "plaintiffs' counsel was put on notice ... and had the same opportunity as defense counsel had to be present." Majority Opinion, Part XI, p. 17. Appellants' brief agrees that the trial court replied to a defense interview of jury request by saying, "Well, we will discuss it. It is their decision. [R.T. 3933]" Appellants' Brief, p. 13. The brief also states that the foundation for its contentions is contained in sworn affidavits of Mr. Moore, Mr. Harney, and Mr. McMahon, all counsel for plaintiffs.

Following the trial court's "It is their decision" statement appellants' brief presents this argument:

The jury's verdict was rendered at approximately 11:25 a.m. in open court. At 1:30 p.m. on the same date, two of plaintiff's attorneys, Michael Moore and Patrick Furey, arrived at the Ada County

Courthouse only to be advised that members of the jury still in the courthouse were meeting with Mr. Carlson and other representatives of Merrell, a fact immediately verified by counsel. There had been no order permitting such contact to our knowledge although still later on the same day one juror revealed that defense counsel, the trial judge and all jurors were together for at least three-quarters of an hour discussing various substantive issues in the case *sub judice.* On March 11, 1988, plaintiffs' representatives, upon further discussions with the same juror referred to above, learned that the members of the jury had been ordered not to speak to attorneys involved in this matter. That order emanated from Judge Bail and was executed by the deputy jury commissioner. The juror, David Dyce, would therefore not execute an affidavit reflecting the substance of his conversations on the evening of March 10 with plaintiffs' counsel. See Affidavits of David M. Harney, March 12, 1988, Michael W. Moore, April 4, 1988, Carl A. McMahan, April 4, 1988, together with 'Motion for Relief from Order,' filed March 14, 1988 at C.R. 594, 605, 610, 591, respectively.

Plaintiff sought relief from the trial court's order precluding them from determining whether juror or attorney misconduct had taken place and filed same on March 14, 1988. We requested expedited consideration and argument on the motion, so as to effectively preserve an issue of misconduct at whatever source—jury, counsel, or court—and to more fully develop such facts in support of what already was—and still is—an arguable more than 'straight face' case that a new trial should be granted on the ground that the process was tainted. The trial court refused to rule one way or another in the necessary time frame to enable us to make a complete I.R.C.P. 50 and 59 motion.

When the trial court failed to rule on our motion for relief within the time in which we could have filed motions for new trial and judgment N.O.V., we noted this appeal from the final judgment entered herein on March 22, 1988, including all adverse orders, rulings and decisions made by the court below. We noticed this appeal on April 5, 1988. We respectfully seek reversal of the judgment below and this case reinstated in all respects for a new trial before a different trial judge. Under the circumstances whereby the trial judge met 'secretly' with the jurors and defense counsel and excluded plaintiffs from the 'meeting,' a motion for a new trial would have been futile and an idle act.

Appellants' Brief, p. 13–14.

## ON REHEARING

BAKES, Chief Justice.

A petition for rehearing was granted in this matter and the cause reargued. The Court has reviewed the record and reconsidered the arguments presented by counsel and continues to adhere to the views expressed and the conclusion reached in 1989 Opinion No. 82, filed on June 8, 1989, except that, as to the award of attorney fees on appeal against the appellant Winfree, the fees awarded to the respondent for defending against the appeal of Winfree will be limited to those fees necessarily incurred in defending against the limited issue she raised on appeal. Counsel for respondent, in preparing its memorandum of attorney fees pursuant to I.A.R. 41, will prorate and set out separately that portion of its fees addressed to the issues raised by Winfree on her appeal, and the balance of the fees attributable to the remainder of the case.

On rehearing appellant again argues that the trial court erred in issuing a protective order limiting the litigation discovery, and requiring appellant to avail herself of the information generated by the federal multidistrict action unless she could demonstrate any areas left uncovered by the discovery in that proceeding. The record demonstrates that there were more than eighty depositions taken in the Ohio multi-district litigation covering literally every employee with any relevant connection to the drug in question. Appellant has not shown any

**486**

abuse of discretion on the trial court's part in entering the discovery limitation order.

Our original opinion, as modified herein regarding the proration of attorney fees, is affirmed.

JOHNSON, BOYLE and McDEVITT, JJ., concur.

BISTLINE, Justice, dissenting.

The English journalist, novelist and poet Gilbert Keith Chesterton once wrote that: "There is something to be said for every error, but whatever may be said for it, the most important thing to be said about it is that it is erroneous." A protective order that practically eliminates a litigant's ability to carry a case forward will undoubtedly minimize the amount of judicial resources spent on that case. However, such a protective order will also ensure the downfall of the litigant who is subject to it, and perhaps subject the litigant to paying attorneys' fees because the protective order made the evidence mustered for the case appear to be almost non-existent. So, however much judicial time and energy may have been conserved through the application of a protective order in this case, the fact remains that it was error for the trial judge to apply it, and for this Court to uphold its application.

Counsel for the appellant, David H. Harney, made this point as emphatically and forcefully as possible during the oral reargument:

THE COURT: My question is this: The protective order permitted you to ask the Court for authority to take any deposition that you want to the extent that it wasn't covered in the multi[-district] litigation.

COUNSEL: Absolutely not, Your Honor. Absolutely not. I've never heard that construction with all due respect until this date. What the protective order in effect said was that we could not take any of the depositions that we noticed to be taken in Ohio. That we had to somehow or another rely upon depositions taken in multi-district litigation over which we had no control—which we absolutely refused to engage in.

We were invited to engage in it, we were solicited by the federal judge Rubin in Ohio to enter into that multi-district litigation, and absolutely refused to do so and wanted to stay in the state court in Idaho.

THE COURT: Let me quote you from page 222 of the transcript, the next to last page. The protective order reads: "If more specific information is provided to the court showing that there are areas which have not previously been subject to discovery, the court would permit discovery in those matters."

COUNSEL: Yes, and we did later on in December 1987, make a motion for an order ... we made a motion for reconsideration and a motion for an order shortening time. Each was denied within seconds of the time of filing with a great big writing, "Denied," Deborah Bail, District Judge. We never had a hearing on either one.

THE COURT: That was not a motion showing that there are areas that you have not been able to obtain by use of the depositions in the multi-district litigation and therefore you request permission. That merely asks her to reconsider the decision that she'd already made. Is that correct?

COUNSEL: It was a motion for reconsideration, yes, Your Honor, but there was no way that we could ever present to any judge in this state or any other state the questions that we were going to ask of the adverse witnesses and compare those questions with questions that were asked by somebody else unknown to us in multi-district litigation. A litigant is not required, in taking a deposition or getting testimony from an adverse witness, to make an offer of proof. Absolutely not required to do so. That's the effect of what Judge Bail said when she used the language which is in the court's opinion here: "If more specific information is provided to the court showing that there are areas which have not previously been the subject of discovery, the court would permit dis-

covery into those matters." Well, that would require an offer of proof on our part. It would require us to obtain massive information consisting of thousands and thousands of pages for me to reveal my intent in taking an adverse witnesses' deposition and say now this is what I intend to ask and this is what some other unknown attorney asked on some date three, four, five years ago. There is no such procedure that I'm aware of that's authorized by law, Your Honor.

THE COURT: Counsel, irrespective of any MDL [multi-district litigation] proceedings the trial judge, you would grant, has the right to control discovery.

COUNSEL: Not this type of discovery, Your Honor. This is an absolute right. The right to take adverse witnesses' depositions, the executive of the defendant company, is an absolute right. It's part of due process. This is a child who has suffered the loss of an arm due to the ingestion of Bendectin according to her theory. Now, let's assume just hypothetically, that I were allowed to go to Ohio and take the deposition of the one at Merrell Dow most knowledgeable about side effects and adverse reactions, and I give that person a hypothetical question in a deposition where he is under oath. And I say now, please assume that the mother in this case had no genetic problem in her family and assume that the father in this case had no genetic problem in the family of his by which to cause the child to have an inherited defect by which she is born without an arm. Assume further that the mother in this case, during the crucial point of her pregnancy ingested nothing other than Bendectin. Assume that she ingested no other drug. Assume that she was not exposed to any toxic substance. Mr. Scientist at Merrell Dow, do you have any opinion as to the cause of this child being born without an arm? Answer: Yes, the ingestion of Bendectin by the mother, if you prove all of those things. But I was

denied the opportunity of ever going to Ohio and taking any depositions.

THE COURT: Do you find this right to discovery in the sixth amendment?

COUNSEL: I find it absolute, Your Honor, without any question or equivocation. An absolute right.

THE COURT: Mr. Harney, are you here telling us that that very same question was not propounded to that very same witness in the depositions in the multi-state litigation in Ohio, which you had available to you by merely paying the cost of obtaining them?

COUNSEL: Absolutely, and on that matter of cost. There is no evidence whatsoever in this record, Your Honor, with all due respect, as to what the cost would be per deposition or if they could ever be transcribed, or if they were transcribed. There is absolutely no evidence in this record to that effect.

THE COURT: But you are representing to this Court that that question was not asked.

COUNSEL: Absolutely, to my knowledge. It was never asked.

THE COURT: I mean, I guess we'd find out what your knowledge is. Did you go back and examine the depositions to see what was available?

COUNSEL: I did not. I talked to lawyers who were involved in it, who thought that the depositions were incompetently taken and one resigned from the committee because of that. I talked to Judge Rubin at the ABA convention, or not the convention but a special meeting in Lexington, Kentucky, to which I was invited by the president of the American Bar Association. I talked to those people about this case ...

THE COURT: I think we're outside the record now, aren't we? Quite a ways out.

COUNSEL: With all due respect, I think that the statement of this Supreme Court is outside the record because there is no record as to what the cost of any such deposition would have

been, or if it was accessible or obtainable. There is no evidence. There was some statement made by a Merrell Dow attorney on the subject. That's not evidence, that's hearsay.

THE COURT: It seems to me that the order permitted you to go right back to Judge Bail and say we have attempted to get that information, it isn't available, therefore we want to take depositions. And as I read her order, she would have given you that permission she said she would ...

COUNSEL: No way, Your Honor. If I may say, I've got the transcript of the hearing of August 19, 1987, right here. That's the transcript to which Judge Bail refers in her protective order quoted by this Court in its majority opinion: "The depositions taken in the federal multi-district litigation cover the areas which the plaintiffs now seek damages." Absolutely false and no evidence whatsoever in any record to support that statement quoted by this Court in its majority opinion. Next statement: "At oral argument on the motion for protective order this Court repeatedly asked plaintiffs' counsel what information was sought that was not already contained in the depositions which have already been taken in the multi-district litigation." Again, absolutely false, no such question by Judge Bail. And then she goes on to deprecate us by saying: "Counsels' only response was the vague statement that they would like to approach the case in their own way." There's nothing vague when we demanded then, and we demand now, the right to depose adverse witnesses in a drug liability case. There's nothing vague about that. That's her characterization. Then she goes on to say, as previously stated: "However, the depositions taken already accomplish that ..." How would Judge Bail ever know that? She never read the depositions. How would she know what they said? How would she ever know what I intended to ask? It just absolutely baffles me and puzzles me. I hate to

be so vitriolic about this, Your Honors, but I'm very disturbed. I've been practicing law for 41 years, it's never happened before in my career. Never, ever, that we want to take a deposition of an adverse party or its agent or executive wherever that might be, in Detroit, Michigan, Dearborn, Michigan, Cincinnati, Ohio, and the right has been denied. Now, there may be some cases where its a nonparty and its not necessary, but this is a party and they manufactured, they designed, they researched, they distributed the Bendectin which we claim, being ingested by the mother, was the cause of Sally, not somebody else in Ohio, but Sally being born without an arm. We had nothing to do with any of the Ohio litigants, nothing whatsoever. We had nothing to do with their counsel, we had nothing to do with the questions they asked, or how the proceedings were conducted. We had nothing to do with restrictive orders by Judge Rubin in the multi-district litigation about what questions could be put to what witnesses under what circumstances. We had an independent trial to go in the state of Idaho, not some other place, not some other plaintiff. We had one plaintiff, the injured child. Nobody else. That was our one and only client in this matter.

THE COURT: If your constitutional rights have been violated by this procedure, then the constitutional rights of everybody else in the federal multi-district litigation have also been violated.

COUNSEL: I would say yes, but I'm not involved in that. I deliberately stayed out, and I've already alluded to what I told Judge Rubin and I'm not going to repeat that. But I do think that their constitutional rights were violated and I don't think that the case was presented properly at any time back there. I really mean that sincerely. The other thing is that in the unique geography of this case. This case is pending in state court in Idaho, the subpoena power that we might have ends at the border of the state. We had no right

to go back to Ohio and subpoena these people, like the one most knowledgeable about side effects and adverse reactions. The only possible way of presenting that trial testimony was by way of the taking of depositions in Ohio. To which we agreed. It's in the record. We said we will go and we will limit all of these depositions to a total of two days. There's nothing onerous or bad about that, but we have been chastised by this Court and by the trial court for not presenting a better case. We couldn't present anything better because it was denied to us. My hands were tied behind my back in this case by being disallowed the right to go back there, and I could have made all of the arguments in the world to Judge Bail. In August, Judge Bail said, and this is interesting, this is after a fairly lengthy hearing, she says, page 23 of the transcript, she's referring to the ones that I have talked about today—the designees of Merrell Dow: "As to the others, I will allow you to inquire into areas that have not previously been inquired into in the multi-district litigation and require that objection be made as to specific questions so that I can have some basis to evaluate whether or not this is a new area. But I don't want to duplicate what's gone in the multi-district litigation." At that time she is allowing this. Months later she grants the protective order. We asked for reconsideration. It was denied. I think it would have been an absolute total waste of time to attempt with Judge Bail to get any relief. She denied it twice. She granted it originally, then she denied it twice thereafter. I notice, Your Honor, that the red light is on. Thank you very much.

. . . .

THE COURT: Mr. Harney, I don't want to distract you from your chorus, but I've got a question that needs to be answered for me. Obviously, trial courts have the responsibility and the authority to control the course of that litigation.

COUNSEL: Yes.

THE COURT: Perhaps other judges may or may not have granted that order, but once it was in place it was something you had to deal with. I would like to know precisely what showing was made as to both need and new evidence not covered by these former depositions in the multi-district litigation. That's the overwhelming question I'm dealing with right now.

COUNSEL: Yes. In the motion for reconsideration which was lodged in these proceedings ... it has a filing date of December 7, 1987, and the motion to reconsider states: "Come now the plaintiffs and move this court for an order reconsidering its decision entered in August 1987, and allowing plaintiffs to take the depositions of certain employees of Merrell Dow and the deposition of Paul Oreffice in conjunction with the deposition of plaintiffs' and defendants' expert witnesses as this case is prepared for trial. This motion is made and based upon Rule 26 allowing such discovery in the interests of justice the court's order itself allowing reconsideration 'upon additional showing' and Rule 11 permitting such motions for such reconsideration." That was the effort that we made to undo that which Judge Bail did by way of the protective order.

THE COURT: I understand that. My concern is what showing was made as to necessity or new information.

COUNSEL: Without getting the answers in Ohio, there's no showing that I could have made. No way in the world, Your Honor ...

THE COURT: Excuse me. You're just requesting the court to reconsider because you needed this additional discovery. But there is no showing as to what the need was nor as to what the new evidence may be, or even an indication of what it might be.

COUNSEL: Well, Your Honor, with all due respect, I started my career working as a research attorney for the Court of Appeal in San Francisco in 1948, and I

knew in law school, I knew then, and I know today that you cannot prevail on behalf of a legitimate client unless you can produce evidence in court and if you're suing a drug manufacturer who has the responsibility of research, testing, designing, promoting, and marketing, and selling a drug without going to the source of that you can't win the case. I don't need to tell anybody that. Nobody needs to tell me that. I mean its a fact of life, it really is.

THE COURT: I understand that.

COUNSEL: I don't know what else we could have done.

THE COURT: Well, did you take advantage of the materials in the repository to formulate what you were looking for?

COUNSEL: No, because I said earlier that I don't have to make an offer of proof. I don't have to say, now, Mr. Chesley in Cincinnati asked the following lousy questions for 14 days of somebody. I don't have to do that. I have no obligation to do that, Your Honor, so the answer flat out is no, I didn't do it, and I'd never do it in the future. I've never done it in the past, I've never had to do it in the past, and I hope I never have to do it in the future. That's my answer. Does it answer ...

THE COURT: Well, I think you're misperceiving my approach in trying ...

COUNSEL: I only have seven minutes Your Honor, but go ahead ...

THE COURT: You're misperceiving my inquiry. I'm trying to gather from you and glean from you something to help your position and you're making it quite difficult for me to understand what it is the showing that was made ...

COUNSEL: We made a showing in August on the basis of which Judge Bail said you go back there and take the depositions. We made that showing. She went along with us. She so stated. A month or a month and a half later she changed her mind and issued the protective order. A month or a month and a half after that we come in and

ask for reconsideration, and she denied it. Flat out.

THE COURT: Was the change of mind period after she had reviewed the five depositions?

COUNSEL: No, because here's what the record shows was handed to her. This is a transcript of August 19, 1987: "The Court: Are those extra copies that you have available, do you mind if I look at those? Mr. Berry, representing Merrell Dow: Yes I have, Your Honor, with the caution that I did not attach the exhibits. The Court: All right, I'd like to see those, I'd like to review just generally what the areas of inquiry were and satisfy some questions I have about that." I don't know what was handed to her. It was never shown to me. It's not in the record. I have no idea what she reviewed, if she reviewed anything. But this was in August and thereafter on page 23, she says go ahead and take the depositions. This is after whatever was handed to her was looked at by her. Does that answer Your Honor's question?

THE COURT: Go ahead.

COUNSEL: I don't mean to be impolite, but I'm agitated. The thing that's been overlooked, I think, by the Court and the defense here, is the defense has the burden. If the plaintiff wants to take a deposition in Ohio, the plaintiff has an absolute right. If the defense wants to get a protective order, they have the burden of proving all of the grounds for the granting thereof which they did not do in this case by any stretch of the legal judicial imagination they didn't state any ground for a protective order. They had the burden. We've cited the cases. Now the expenses that were talked about—I'll never understand that as long as I live. If these depositions were so wonderful, swell, beautiful, and great, why did I want to go to the expense of going to Ohio? Why in the world would I run up the additional travel expense, deposition expense, video expense, audio expense, and everything else if I thought

everything had been beautifully done in the multi-litigation? And I think its extremely important here that none of the Merrell Dow people were called live at the trial. I had nothing to chew on in trial either. I'm denied the opportunity to go to Ohio and then they deny as their option gave them the right as they had to call these people out to Idaho, so the jury never got to see any of these people. And repeated questions today, "Well, weren't these things asked in the multi-district?" Not one single person in this world ever asked a question about Sally Cosgrove until we began her representation. Not one single word of anybody in Ohio in any multi-district litigation about Sally Cosgrove, the plaintiff in this case. If there's no familial reason for the loss of her arm, if the mother never ingested anything else except Bendectin and she was not exposed to any toxic substance, why did she get born without an arm? Never ever asked by anyone. And Mr. Carlson [counsel for respondent], I hate to say a few minutes ago in telling you that some state court has granted the type of protective order in a Bendectin case that was not multi-districted, I believe is a total falsehood. I'm aware of no such case, Your Honors. One final thing. A legal scholar described cross-examination as the greatest engine ever invented for the discovery of truth. I think you all know from your experience that you can take a hypothetical case where somebody allegedly is going too fast and one attorney says, "Now, Charlie, weren't you going too fast on highway so-and-so outside of Boise that night?" "Oh no, I wasn't going too fast." Another attorney: "Charlie, you were going too fast that night, and you know it, don't you?" "Yes, sir, but that wasn't the cause of the injury." Thank you, Your Honors.

THE COURT: Thank you, Mr. Harney.

In what may perhaps become the signature of this Court, the requisite number of votes were mustered in order to reconsider an opinion, yet the opinion remains practically the same after a second look. I could not agree with the majority's first opinion, and I cannot agree with its second opinion following the rehearing. No one in the majority has tendered any response to seriously urged dissenting views, which to my mind does a disservice to a trial bar which might desire to be enlightened as to the majority's perceived fallacies in another point of view, especially when the majority has ample time to do so after a reargument.