798 P.2d 34

**Rena Dailene BRALEY,
Plaintiff–Respondent,**

v.

**Daniel E. PANGBURN,
Defendant–Appellant.**

**Nos. 17580, 17663.**

Supreme Court of Idaho.

Sept. 6, 1990.

Benoit, Alexander, Sinclair, Doerr, Harwood & High, Twin Falls, for defendant-appellant. John A. Doerr argued.

Hepworth, Nungester & Lezamiz, Twin Falls, for plaintiff-respondent. John Hepworth and J. Charles Hepworth argued.

BISTLINE, Justice.

This action was brought by Rena Dailene Braley (plaintiff) to recover damages from Daniel Pangburn (defendant) as a result of injuries suffered by Braley which were proximately caused by Pangburn's negligent operation of a motor vehicle in which Braley was riding as a passenger. The vehicle left the road at a high rate of speed and rolled over two or three times. Initially Pangburn denied liability.

....

After the case was at issue, and after extensive discovery, the court set a date for the jury trial which had been demanded by the plaintiff. Apparently, after some discussion between involved counsel, an understanding was reached that the defendant would concede sole responsibility and liability for the plaintiff's injuries. On the date of trial a formal stipulation so stating was entered on the record. At the same time the court stated for the record that the parties having stipulated to waive the jury, the issue of damages would be tried to the court. The parties also requested that the court read the depositions of Dr. Burton, Dr. Phillips, and Dr. Retmier.

The testimony of the lay witnesses was taken at trial, after which the court prepared and issued its written decision which constituted the findings of fact and conclusions of law. Detailed statements of the plaintiff's multiple injuries were set out, the more serious of which were five broken ribs, some with displacement, and compression fractures of several thoracic vertebrate. The court noted its finding that, "[u]nquestionably the plaintiff suffers compression fractures at five levels in her thoracic spine ... representing permanent injuries to the spine which cannot improve but may become worse as the plaintiff ages." Other findings included "common degenerative changes which may result from compression fractures ... disc space narrowing at levels T–8 and T–9 ... presence of osteophytes or spurring ... permanent conditions ... and in fact will remain the same or worsen." The court made findings as to the extent of Braley's resultant disablement: A seven day hospital stay, being virtually bed-ridden at home for the ensuing month, wearing a Jewett brace for three months, and being unable to return to her employment or do her housework until seven months after the injuries were suffered. Damages were set by the court on an itemized basis, both past and prospective, for medical expenses, loss of income, loss of household services, pain and suffering, and loss of the enjoyment of life, totaling $165,228.84.

The defendant timely moved for a new trial. No challenge was made to the

court's assessment of damages or to the sufficiency of the evidence to substantiate those damages. Instead the motion was predicated on alleged irregularities, including accident or surprise and error-in-law. I.R.C.P. 59(a)(1), (a)(3), and (a)(7). The supporting affidavit of defense counsel narrates his involvement in the case and the circumstances which are relied upon to substantiate the alleged grounds for a new trial:

At the time I received the file to defend the action, I received ... records showing that plaintiff had been seen by [Dr.] Pressman at the emergency room of Magic Valley Regional Medical Center, by [Dr.] Phillips in consultation and treatment and by physician neurologist Schaffert in consultation.

The records of the emergency room of February 21, 1986, disclosed a 'possible compression fracture of T–7, left posterior rib fractures, contusions abrasions, left forearm laceration.'

Dr. Phillips saw plaintiff at the hospital on February 21, 1986, and reported impressions of '(1) multiple abrasions and contusions of the head, chest, extremities; (2) multiple rib fractures; (3) rule out dorsal spine compression fracture.'

X-rays and Tomograms taken at the Magic Valley Medical Center on February 24, 1986 showed compression fractures of T–7, T–9, T–10, T–11 and T–12, with fractures of ribs 5th through 9th on the left. The Tomograms showed a loss of the anterior height of T–9 of approximately 5 mm with no loss of height of the posterior portion, loss of anterior height of T–9 of approximately 3 mm, and minimal anterior superior compression of T–10, T–11 and T–12 with minimal loss of vertebral height.

*No* other problems were diagnosed by Dr. Phillips or revealed by x-ray or Tomogram.

Dr. Phillips's records showed that he saw her five times from March 5, 1986, two weeks after the accident, until September 2, 1986, at which time he referred her to Dr. Schaffert.

Dr. Schaffert saw her on September 9, 1986, September 24, 1986, and October 20, 1986, and concluded his report of October 20, 1986 with 'Examination of low back demonstrated good range of motion and no bony abnormalities or paravertebral muscle spasms. There is no tenderness to palpitation.' With impression of '1) continued complaints of left shoulder girdle strain; 2) continued complaints of low back pain.' In his report of September 9, 1986, Dr. Schaffert reported under impressions, 'History of thoracic vertebral fractures which should have been healed by this time or should be very nearly healed by this time.'

Dr. Schaffert diagnosed *no* other problems.

. . . .

In September, 1987 [defense counsel] ... [had] the plaintiff examined by [Dr.] Robert Burton ... on November 11, 1987.

Dr. Burton received all the records previously noted, including all of the reports of x-rays which had been taken to that date, and the actual x-rays.

. . . .

With the records of ... Pressman, Phillips, Schaffert and Burton in hand, on March 7, 1988, interrogatories and request for production of documents were served on plaintiff's attorneys.

Among the interrogatories was one (No. 3) asking the plaintiff to describe in detail all injuries received as a result of the accident.

The interrogatories were answered on April 7, 1988.

The answer to No. 3 was a copy of '*all* medical records accumulated since the accident of February 20, 1987.'

Those records included the records of Dr. Pressman, Dr. Phillips, and Dr. Schaffert, which were the same records previously received....

[I]n addition, records of Dr. James Retmier, an orthopedist, were attached. They include records of two visits; one on September 28, 1987, and the other on October 30, 1987. In his report of September 28, 1987 ... Dr. Retmier's impressions were 'status post MVA (motor

vehicle accident) with (a) lacerations apparently at least to the level of the muscle on the dorsum of her left forearm, with resultant mild loss of sensation on the dorsum of the forearm, just distal to the wound. No other definite functional loss. (b) Compression fractures of thoracic vertebrates Nos. 7 and 9 with less than 25% compression and no evidence for neurologic deficit or spinal instability present. (c) Chronic upper back and low back pain since the time of her injury; which is undoubtedly resulted [sic] from musculoskeletal spasms and strains, associated with the trauma at the time of her accident; which loss (in my mind) never been completely addressed.'

These answers to interrogatories and responses to request for production of documents did not include any medical evidence that had not been previously seen or reviewed except for the records of Dr. Retmier which confirmed that reported by Drs. Phillips, Schaffert and Burton.

Dr. Burton became unavailable for trial and arrangements were made to perpetuate his testimony and his deposition was taken on May 17, 1988.

I was advised that Drs. Phillips and Retmier would be unavailable and that their depositions would be taken. Later I was told that Dr. Phillips would not be called as a witness, and I elected to call him to perpetuate the treatment of which I was then aware. His deposition was scheduled for May 18, 1988, six days prior to trial. Dr. Retmier's deposition was scheduled for May 19, 1988, five days prior to trial.

In the course of taking the deposition of Dr. Phillips, it was determined that he had just prior to the deposition examined and re-x-rayed plaintiff. He testified that he made new findings; namely, disc space narrowing and the presence of osteoplytes at the level of the compressed T–9 and T–7.

Neither Mr. John Hepworth nor his son J. Charles Hepworth nor John Lezamiz, counsel for plaintiff, all of whom were present at the time of the deposition, told me at any time prior to the deposition, that Dr. Phillips was planning to examine her again, or had in fact done so, or that there were any significant new findings by examination or x-rays.

Dr. Phillips went on to testify that on the basis of his recent examination and x-rays that these new findings were significant.

Dr. Retmier, on the following day, testified that he too had examined the plaintiff on that day. Counsel for plaintiff did not advise me that they intended to have her examined or that she had in fact been examined.

Dr. Retmier testified on the basis of that examination and discussions had with her as to her future back problems and presented evidence of osteophytes and disc space narrowing and the consequence thereof, none of which had been previously reported. The doctor based his testimony on the x-rays taken on the day previous by Dr. Phillips.

Then, on the day of trial, plaintiff introduced the evidence of Dr. Hoffman, who was not listed as a witness in plaintiff's answer to interrogatories. He testified [over objection], about osteophytes and disc space narrowing on the basis of x-rays taken on May 18, 1988 by Dr. Phillips.

And then Dr. Schaffert testified, at trial, that he had examined the plaintiff on the day before, or on the day of his testimony, and that on the basis of that recent examination, and of the x-rays taken by Dr. Phillips on May 18, 1988, that she had disc space narrowing and that that condition was going to cause her pain for the rest of her life and that the situation was going to deteriorate with time.

None of the plaintiff's counsel advised me that any of these examinations or x-rays were going to take place, or, at any time prior to the depositions or trial, that there was any new evidence or findings relating to the condition of the plaintiff.

I was unable to have the plaintiff reexamined or to have the recent examina-

tion of those physicians critiqued or independently examined.

The new evidence was prejudicial to the defense of the case and, both technically and in spirit, in violation of Rule 26(e) of the Idaho Rules of Civil Procedure, which is intended to give the parties a fair trial of all issues.

R., Vol. 4, 79–86 (emphasis in original).

The theme of the defendant's motion for a new trial was, in essence, a claim that the litigation had not been fairly conducted. The defense asserted in particular that testimony was adduced at trial of which it had inadequate forewarning, and hence no time to marshal any rebutting medical testimony. That assertion necessarily assumes that with the opportunity to do so, defense would have had plaintiff examined by doctors of its choosing who, one is left to assume, could counter the evidence which established her physical impairment. In sum, the defendant argues that the rules of civil procedure and counsel-to-counsel courtesy required that plaintiff should have (1) advised that there would be another examination of plaintiff, and (2) should have divulged the result of those examinations which were conducted as the trial date rapidly approached.

That contention, of course, has to be considered in light of the overall picture. The complaint was filed in late October of 1986. The answer was filed in mid-December of 1986. Trial was set for May 24, 1988, by notice of setting issued on December 21, 1987. Defendant did not depose any of plaintiff's treating physicians, but rather relied on the medical reports which were furnished, and appears to have been relying heavily on Dr. Burton's testimony to be given at trial to persuade a jury as to the extent and probable duration of Braley's injuries. Dr. Burton had examined Braley on November 11, 1987, which was twenty-one months after the accident. He was scheduled as the only medical witness who at trial would be called by the defense. However, fate occasioned a change in plans; Dr. Burton would not be available on the date which was scheduled for trial. On May 17, 1988, with the trial scheduled to take place on May 24, 1988, the defendant deposed Dr. Burton, with the parties agreeing that the deposition would be in lieu of the doctor testifying in person at trial. John Lezamiz, of counsel for plaintiff, appeared at the deposition to cross-examine Dr. Burton following Mr. Doerr's direct examination. Dr. Burton's testimony was supportive of the findings which the court would thereafter make, particularly as to the fractures of the ribs, resultant hemothorax, pneumothorax, a questionable compression fracture of T–6 and documented fractures of T–10, T–11, and T–12. The doctor's testimony would also support the court's findings as to the period of Braley's disability and confinement:

Q. [W]ould her continuing complaints of some loss of sensory perception as a result of that injury [laceration of the forearm] be surprising or not? The extent of the injury that she did sustain?

A. No, I believe that is appropriate for the injury described.

Q. After the seven days of bed rest that was prescribed by Dr. Phillips, Rena Braley was fitted with a Jewett brace, what would the normal course of recovery for the patient be after that? Would you expect her to be up and about or would you expect her to be pretty much confined to bed following this type of injury and this type of treatment?

A. No. I think to dismiss her from the hospital after seven days and to tell her to be up and about would be inappropriate.

I think she stated that she basically was down for two to three months, two months.

Q. She also has stated in her deposition and I think the record of Dr. Metz reveals that she was unable to return to work until sometime in mid or late October 1986. Would that be consistent with the type of injuries that she had sustained?

A. I believe so.

Deposition of Dr. Burton at 48. Dr. Burton was in agreement with what he had read on Dr. Retmier's reports:

Q. You referred to Dr. Retmier's report during your direct examination and as I understand, you agreed with his findings and felt the two of you were consistent in your evaluation of this lady's injuries; correct?

A. I think basically we came to similar conclusions. He had no findings that were a surprise to me and I suspect if he read mine he would find no surprises.

Q. Let me read to you from his September 28, 1987, report and ask you if you agree.

His impression was that she was: '1, status motor vehicle accident with A, a laceration apparently at least the level of the muscle on the dorsal of the left forearm, resultant mild loss of sensation on the dorsal forearm distal to the wound. No other definite functional loss.

'Compression fractures of the thoracic vertebra 7 and 9 with less than 25 percent compression with no evidence of neurologic deficit or spinal instability.

'Chronic upper back and low back pain since the time of her injury which undoubtedly resulted from muscle ligamentous skeletal sprain and strain associated with trauma at the time of her accident which has in my mind never been completely addressed.'

Do you agree with his impression and diagnosis?

A. I didn't find anything to disagree with what you have read.

Q. The complaints that Rena Braley has with respect to her neck, her upper back, her mid back, her low back, those have been present, have they not, since the time of this accident?

A. Correct. She had no complaints that I could elicit prior to the accident, similar problems.

*Id.*, 49–51.

Defense counsel established no unfair practice in regard to getting Dr. Burton's testimony before the district court, and he had access to the reports of her treating doctors. Rather, defense counsel's complaint, if it is found anywhere, seems to lie in having first understood that Dr. Phillips also would testify by deposition, but later:

[G]ot the impression from a conversation I had with them that they had not intended to call Doctor Phillips. So we wanted what Doctor Phillips had to say of record, and so noticed up the taking of his deposition and agreed that we would attend the taking of the deposition of Doctor Retmier.

Tr., Vol. 1 at 3. According to counsel's own affidavit supporting his motion for a new trial, he made the decision to take the deposition of Dr. Phillips. Although the affidavit purported to inform the district court only that in taking the deposition "it was determined that he had just prior to the deposition examined and rex-rayed plaintiff, ... made new findings, namely, disc narrowing and the presence of osteophytes at the level of the compressed T–9 and T–7," it was defense counsel's questions to Dr. Phillips which brought forth that information:

[Mr. Doerr] Q: When did she come to see you today?

A: I saw her this afternoon in the office for a follow-up visit, sir.

Q: And did you do any x-rays?

A: Yes, sir.

Q: And what did you find by way of x-ray?

A: I x-rayed her spine in a manner similar to that which we have been following her. I also took lumbar spine films as well. We can see healing of her 7th thoracic vertebral fracture. We see some, I feel, degenerate change in the intervertebral disc between the 8th and 9th thoracic vertebra. The other fractures appear to have healed.

Deposition of [Dr.] Michael Phillips, M.D. at 24–25.

Braley's brief filed in this Court depicts the scene thus:

During the examination of Dr. Phillips, Pangburn's counsel had the opportunity to object to any evidence pertaining to the examination on the day of the deposition if he felt that was appropriate. Instead, Pangburn's counsel chose to forge ahead taking the calculated gamble that the testimony from the witness would be helpful and supportive of his case. In-

stead, the witness explained the findings on the x-rays and discussed the degenerative changes which Dr. Phillips had observed. The damaging testimony which serves as the basis for Pangburn's appeal came from Pangburn's own witness and, as the District Court pointed out it would not be appropriate to vacate the trial date to allow Pangburn an opportunity to make arrangements to impeach his own witness.

Respondent's Brief at 28–29.

█ In the ensuing paragraph of Mr. Doerr's affidavit above-mentioned, complaint is made that none of plaintiff's counsel had told defense counsel at any time prior to the deposition that Dr. Phillips had examined plaintiff again, or taken new x-rays. The affidavit makes the same complaint relative to Dr. Retmier having re-examined the plaintiff on the same day as did Dr. Phillips, and again that defense counsel was not informed thereof. Likewise, the defendant contends that it was unfair for Dr. Schaffert to testify at trial that he had on that day or the day before reviewed the report of Dr. Retmier and the x-rays taken by Dr. Phillips, and based thereon concluded that Braley had disc space narrowing.

At argument on the motion for a new trial, defense counsel elaborated on the matters which had been first mentioned in the affidavit. Primarily, he explained that the early reports of Dr. Phillips, with which he had been furnished, were supportive of the defense position, *i.e.*, that the plaintiff's complaints and symptoms were about a sprain and strain musculoligamentous-type injury. So the conclusion was reached by defense counsel that Dr. Phillips would, on answering questions, "tell me the same things that he had told me in the letters that I received ... in response to our requests for production of documents." The sum of the argument seems to be defense counsel's belief that the rules, or the spirit of the rules, and that which is right and

just, required that plaintiff's counsel should have warned defense counsel that plaintiff had just been, prior to trial, re-examined, and that new findings as to her condition had resulted. The contention was summed up: "We defended this case on the basis of the information that had been furnished to us prior to two or three business days before trial."

Candidly, defense counsel stated:

But it all turns just to Doctor Phillips, just my purpose for going in and documenting the evidence that they had furnished me up to that date. And on that basis *everything has gone awry.* And I don't think it's fair, and I don't think it's under the rules.[1]

Tr., Vol. 2 at 14 (emphasis added). In response to the defense contentions, plaintiff's counsel at the hearing on the motion for a new trial explained in detail why plaintiff decided not to depose Dr. Phillips, and also regarding Dr. Phillips' examination of Braley:

And what happened was Mr. Doerr took the calculated gamble that there was a reason we weren't taking Doctor Phillips' deposition. The reason we were not taking it, frankly, is he was going to be out of town. Doctor Retmier was going to be out of town. Mr., Doctor Burton was going to be out of town. We didn't want to bore a jury to death at that point by presenting ten different depositions that were going to be read into the record. At that point we still had not concluded that it was going to be a court trial. We were still both envisioning a jury trial. And so we made a decision, our firm's strategical decision that rather than present several video-tape or depositions to perpetuate testimony that we would limit it to Doctor Retmier because he could essentially address all the issues that Doctor Phillips was going to address.

At any rate, Mr. Doerr elected to take the deposition of Doctor Phillips. At

---

1. Yet, at the hearing on the motion to vacate the trial setting, counsel spoke thusly:

I was going to use the word that it's unfair. But it isn't a question of being unfair. It's just that some things have now come to light in which we have not had a chance to go to an orthopedic surgeon or a neurologist or an x-ray person and say, look, are these things, are they there; are they consequential; and to present some evidence as to those matters. Tr., Vol. 1 at 5–6.

that time our client was in town getting ready for trial. As we do in all our cases, we want the doctors to be familiar with that particular patient's status to have a fresh memory; and when they see the patient and when they have an opportunity to review that patient's status, they are able to testify more accurately ·at trial. And they have the responsibility—if that patient was previously complaining or making complaints and that patient no longer is making complaints, they have the responsibility to report that just as much as they have the responsibility to report that the complaints are ongoing.

In this particular situation Doctor Phillips at his own choosing, for whatever reason, elected to take x-rays when he examined Rena Braley. During his deposition Mr. Doerr asked the question—and I refer to it in my memorandum. But he essentially says, 'Doctor, I understand that you examined Rena Braley today, is that correct?' 'That's correct.' And I understand—or he asked, 'Did you take x-rays?' And the doctor said, 'Yes, I did.'

At that point in time Mr. Doerr had the opportunity to say no more about those and to object that he had not been provided with those records and would object to any effort on anyone's part to bring that evidence, that information into evidence. Instead what he did was he made the calculated gamble, took the calculated gamble that those x-ray findings were going to be favorable to his position.

And so he asked the next question. And his next question was, 'What did those x-rays show?' And at that minute he injected those x-rays into evidence. And that is now what he is complaining of, the evidence that he injected himself through his whole line of questioning with more than ample opportunity to object at that point or to not ask any questions and to object to any questions asked by us on cross examination asking for information about those x-rays.

Tr., Vol. 2 at 18–20.

Two of the district court's rulings are challenged by Pangburn, denial of the mo-

tion to vacate and denial of the motion for a new trial. At the hearing on the motion to vacate the trial setting, filed on May 20, at which time the trial date of May 24 was closing in, the court conducted a hearing on May 23, and provided counsel with his ruling at that time:

THE COURT: Gentlemen, thank you. A couple of problems with the way this case is postured. In December of '87 this case was set for trial. Pretrial conference was ordered. And a discovery cutoff date was set for May 2nd. The parties have gone on with some amount of discovery after the discovery cutoff date. And my position has been that when you do so, you do so at your own risk.

Now, the problem is exacerbated by the fact that *all of these* [medical] *witnesses are going to be presented by way of deposition* so that neither party has the opportunity by way of cross examination to in any further way test the theories that the experts are presenting to the court.

Notwithstanding that, I am going to deny the motion for a continuance principally on the basis not that it's necessarily as fair as I would like to see it, but that when discovery is conducted after the discovery cutoff date you do so at your own risk. And under these circumstances I just feel compelled to proceed to trial. It's not a perfect set of circumstances, I will acknowledge.

Tr., Vol. 1 at 12 (emphasis added). The court also favored counsel by immediately explaining its denial of the motion for a new trial:

THE COURT: Counsel, first, taking the motion for a new trial, the defense has requested a new trial on the basis that essentially they were ambushed as a result of the deposition of Doctor Phillips. There is nothing in the rules which allows a party the continuation of a trial for the purpose of putting together impeachment of their own witness. *Doctor Phillips became the defense's witness.* When either discovery or depositions to perpetuate the testimony of a witness are taken well after the discovery cutoff

date and pretrial conference, one does so at risk. It's unfortunate in this circumstance, but that risk was taken. And I elected then and continue to adhere to the view that trials must proceed on that basis. I cannot find any tactic on the part of plaintiff which allows me to say that they violated the code of professional responsibility in the way they dealt with Doctor Phillips, in which case, of course, I would grant a new trial.

Tr., Vol. 2 at 31 (emphasis added). The rulings on both the motion to vacate the trial setting and the motion for a new trial were rulings well within the discretion regularly exercised by trial courts. The trial court favored the parties, and in turn this Court, with the reasons for those rulings. The rulings were not arbitrarily made, but on the contrary, demonstrate that the district court was acting well within its discretion, and we are not persuaded of any abuse in either instance.

At that same hearing, the court explained its ruling on plaintiff's request for an award of attorney's fees:

With respect to the objection to costs and fees, Counsel, I am well acquainted with the Supreme Court and Court of Appeals decisions dealing with the conduct of settlement negotiations. They have ruled consistently and unequivocally under Rule 54(e) that one cannot—a court cannot award attorney fees on the basis of conduct which occurred during the course of settlement discussions and negotiations. They tell me, I think, through those decisions that that conduct is not the type of conduct which is envisioned in the rule when they talk about a defense that is frivolous, meritless or a basis without foundation. I will say I am not entirely sure I agree with the appellate courts, but that has been the long-settled law in this state.

I cannot find that the case was defended frivolously. I do note for the record that the defense did admit liability in this case, and that it was in fact counsel for the defense that, I think, assisted his client in making that determination.

Tr., Vol. 2 at 31–32.

■ The appeal of the plaintiff based on the court's failure to assess attorney fees against the defendant on the basis of Rule 54(1)(e), as being frivolous or without foundation, however did not in our view involve an exercise of judicial discretion. The district court explained quite accurately that settlement negotiations and an asserted failure to settle do not amount to the type of conduct which may precipitate an award of attorney fees against a nonprevailing party. Moreover, it would be an unusual case where attorney fees would be assessed against a defendant who conceded liability, notwithstanding the fact that possible defenses were available and that the foregoing of the same was beneficial to the·judicial system, and likewise to the plaintiff, who accordingly could concentrate solely on the issue of damages.

■ Additionally, as noted by the district court, this Court has precluded the award of attorney fees for failure to conduct good faith negotiations. In *Ross v. Coleman*, 114 Idaho 817, 761 P.2d 1169 (1988), the Court wrote:

Today, we again make explicit that which we held in *Payne v. Foley, supra* [102 Idaho 760, 639 P.2d 1126 (1982)], that 'there is no authority in a trial court to insist upon, oversee, or second guess settlement negotiations, if any, and certainly no authority to impose sanctions for "bad faith" bargaining.' *Payne v. Foley, supra*, 102 Idaho at 763, 639 P.2d at 1129 (Bistline, J., specially concurring). The district court erred when it imposed costs and attorney fees for failure to engage in good faith settlement negotiations, and accordingly the order must be reversed for that reason.

*Ross*, 114 Idaho at 836, 761 P.2d at 1188.

The district court is affirmed in all respects. Costs to plaintiff.

BAKES, C.J., and JOHNSON, BOYLE and McDEVITT, JJ. concur.