846 P.2d 207

**Steven L. HOPKINS and Cheryl Hopkins, husband and wife, Plaintiffs–Appellants,**

v.

**DUO–FAST CORPORATION, an Illinois corporation; Duo–Fast Corporation, Northwest Sales and Service Division, an Illinois corporation in good standing in the State of Idaho, Defendants–Respondents.**

No. 18372.

Supreme Court of Idaho, Boise, September 1992 Term.

Jan. 28, 1993.

Howard & Owens, Coeur d'Alene, for plaintiffs-appellants. Kenneth B. Howard, Jr., argued.

Hall, Farley, Oberrecht & Blanton, Boise, for defendants-respondents. Donald J. Farley, argued.

1992 OPINION NO. 53, FILED MARCH 30, 1992, IS HEREBY WITHDRAWN

**206**

AND THIS OPINION SUBSTITUTED THEREFOR.

## ON REHEARING

McDEVITT, Justice.

Before and after his injury, plaintiff Steven Hopkins worked for Northwest Building Systems ("Northwest"), a manufacturer of modular homes. While at work reviewing a sheet of building specifications, Hopkins was struck in the left eye by a three inch nail and was permanently injured. At the time of this incident, a co-worker was nearby, operating a pneumatic nail gun, which was manufactured by Duo–Fast.[1] Duo–Fast provided Northwest with nail guns and in exchange Northwest purchased all of its nails and other fasteners from Duo–Fast.

Plaintiffs brought a product liability action against Duo–Fast, alleging defects in the nails and nail guns manufactured by Duo–Fast. The plaintiffs' theory at trial was that the nail gun which injured Steven Hopkins should have been provided with a safety device known as a "drop-off," that drop-offs were not provided by Duo–Fast as standard equipment on all of its nail guns, and that some of the nails manufactured by Duo–Fast for the nail guns were of a dimension that would allow them to escape from the guns in tandem. Without the drop-off attachment, when one nail was fired another nail might also be fired from the nail gun on a different trajectory. The gun used by the co-worker did not have a drop-off attachment.

During the trial, the defendants' expert, Bookwalter, modified what had been his earlier testimony in deposition, as the result of determining during the course of direct examination of plaintiffs' witness that he had been provided erroneous information as to the size of the nail head used in the nail gun in question. Bookwalter had been provided the nail head dimension by the defendants based upon information the defendants had provided in the course of discovery to the plaintiffs. Plaintiffs

objected to this revised testimony; after inquiry, the court permitted the testimony.

An additional defense expert witness, Dr. Blotter, had had his deposition taken approximately two weeks prior to the commencement of the trial by the plaintiffs, had described the testing and analysis performed by him at that deposition, and rendered an opinion. Subsequent to this deposition, and prior to his testimony, Dr. Blotter performed additional tests and analysis which changed his testimony to the effect that the nail gun did not generate the velocity required for the accident to have occurred as described by the plaintiffs.

Defense counsel informed plaintiffs' counsel of this contemplated change in testimony the morning that Dr. Blotter was to testify. Plaintiffs' counsel timely objected to the testimony which after inquiry was permitted over plaintiffs' objection.

After both parties presented lay and expert testimony, a jury returned a verdict for Duo–Fast. The jury determined that Duo–Fast did not manufacture an unreasonably dangerous or defective product, and that no warranties had been breached by Duo–Fast.

The issues framed by the plaintiff on appeal with which we must deal are as follows:

1. Did the trial court err in permitting testimony of defendants' experts where:

(a) the defendants' expert deposition testimony was based on information concerning product condition provided by the defendant to the defendants' expert and where the defendant divulged, for the first time at trial, that the information upon which its expert relied and testified at deposition was in error;

(b) the opinions expressed by the defendants' expert witness at the time of his deposition were changed prior to trial, but no notice was given of the changed testimony to the plaintiffs until the day of testimony at trial of the defendants' expert witness;

---

1. Duo–Fast Corporation, an Illinois corporation; Duo–Fast Corporation, Northwest Sales and Service Division, an Illinois corporation in good standing in the state of Idaho, will hereinafter be referred to as "Duo–Fast."

(c) additional tests and analyses were performed after the deposition of the defendants' experts and the results of said tests and analyses were not provided to counsel for plaintiffs until the day of the experts' testimony at trial?

2. Did the trial court err in giving the jury a limiting instruction with regard to the introduction of defendants' safety bulletin, plaintiffs' Exhibit 18?

## I.

### DID THE TRIAL COURT ERR IN PERMITTING THE DISPUTED TESTIMONY OF DEFENDANTS' EXPERT WITNESSES

■ The testimony of Jeffrey Bookwalter, to which appellants object, was a result of Mr. Bookwalter learning during the course of plaintiffs' examination of its witness that Bookwalter had used a different dimension nail head than Hopkins' witness Mr. Novak. Bookwalter used the dimension supplied by Novak (plaintiffs' witness) rather than that he had used earlier.

After the timely objection of plaintiffs' counsel to the testimony of Bookwalter, the court made inquiry and determined that Mr. Bookwalter had relied upon engineering drawings of the nails, which were supplied by the defendants to the plaintiffs during discovery, and which became, during this trial, Exhibit 8. These engineering drawings were drawings of a nail then in use, but were of a dimension different than that which was in use at the time of the accident, March 4, 1986.

During plaintiffs' case-in-chief, they called Mr. Novak to establish the actual size of the head of the nail in use at the time of the injuries sustained by the plaintiff. It was during this testimony that Mr. Bookwalter learned for the first time that the information upon which he was relying was improper. Mr. Bookwalter then adjusted his analysis to reflect the evidence introduced by plaintiffs in their case-in-chief, as to the actual nail head dimensions.

The issue, as to the testimony of Dr. Blotter was framed based upon deposition testimony taken approximately two weeks prior to the trial date, and the proffered testimony of Dr. Blotter at the trial.

During the deposition of Dr. Blotter, an expert hired by Duo–Fast, plaintiffs' counsel asked Dr. Blotter whether or not he was going to conduct more tests:

Q. Are there any other opinions that you are going to be expressing in this trial in terms of areas of your evaluation that we haven't already discussed that you can think of?

A. Well, that will depend upon Mr. Farley [opposing counsel] and it will depend on the development of the case. I think if something comes up that needs a technical response as an expert, then I would respond to that request.

. . . .

Q. Dr. Blotter, you can understand I am sure also that I am representing a client and I do not want to be ambushed by new information that comes out ten minutes or two days before trial. You understand that, don't you?

A. Yes, but could I also expect that you would welcome with a welcome hand anything that would add to the truthfulness as to what would happen.

Q. If I had an opportunity to test its truthfulness, yes, but I don't want you to be the sole judge of that. I want to know if you anticipate doing any further work on this [in] advance of trial.

Deposition of Dr. Blotter, 87–88 (taken August 31, 1989).

On the morning of the day that Dr. Blotter testified at trial:

"MR. HOWARD [counsel for Hopkins]: Over the break I asked Mr. Farley if there's any additional work that had been done by Dr. Blotter, who is his next expert witness he intends to call.

"He indicated to me that there was. The court afforded me the opportunity to talk to Dr. Blotter, who's out in the hallway now. I took about 10 minutes to do that.

"I guess I wanted to place my objection on the record. Also there's work that's been done by Dr. Blotter.

"We continued his deposition because he had indicated at his deposition, and Mr.

Farley had, that he might want to do something more. And yet until I asked Mr. Farley this morning, I still wasn't told what it was.

"And he did some force tests and he did some other calculations in regard to shear strength, which I haven't had a chance—I have talked to him about it. But as a practical matter, there is no way that I'm going to be able to get into analyzing what he did so ... that I can effectively interrogate him on that.

"I wanted to place my objection on the record, which is essentially the same objection I placed on the record with regard to Mr. Blotter—Mr. Bookwalter. I'm sorry. That I think it's the defendant's obligation to make that information available to me. Not 15 or 20 minutes before the witness goes on, but long enough for me to be able to meaningfully do something with it.

"And I guess I wanted to object to that. And he isn't on the stand yet, and I appreciate that. But this is in an effort to try and save some time with the jury.

"THE COURT: Mr. Farley?

"MR. FARLEY: Yes, Your Honor.

"I didn't know what Dr. Blotter had done until I met with him late last night. And there wasn't an opportunity for me to even advise Mr. Howard until this point during the day.

"The work that he has done since his deposition was discussed at his deposition and Dr. Blotter alluded to it. He said, I have done this type of a qualitative analysis, but I haven't done a quantitative analysis.

"And essentially that is what has been disclosed by Mr. Howard at this point. And building on the same information that was discussed at his deposition, what his quantitative analysis is based upon that.

"He's had the opportunity to talk to him, spend whatever time he wishes to spend with him. I don't know what else I can say. He's here, he's available for Mr. Howard to speak with for however long he wishes to speak with him.

"If he wishes to take his deposition before he testifies, since I know we're going to be going into tomorrow morning, I've got no problem with paying for the deposition.

"This is a product primarily of the schedule of Dr. Blotter. Period. I mean, he has not, by reason of his schedule, had an opportunity to do this kind of work until just now.

"THE COURT: What did he do specifically?

"MR. FARLEY: At the time of his deposition, he had undertaken some trajectory tests and force tests in a qualitative sense in terms of, All right, this is the kind of thing I would like to do.

"Since his deposition, I learned last night that he has, in essence, done some force tests by going down into his lab. And he's taken the exemplar nailer that he has—which was discussed at his deposition—and he has driven nails with it to determine how much force is necessary in order to drive a nail. The same kind of thing, in fact, it's the same sort of numbers that Mr. Bookwalter has already testified to. In terms of the force required by this nailer in order to drive a nail into the wood. That's, in essence, what he's done in terms of additional tests.

"From that information, he has then done an analysis, if a nail were to be able to get into a position where it could come out to the back of the raceway, what kind of velocity would it have?

"He had done velocity tests at the time his deposition was taken. And he, then and now, is prepared to talk about what kind of velocity a nail that would be projected out the back of the nose, if it got itself into that kind of a configuration, would have and whether or not that would be sufficient to reach the plaintiff in the location that he's standing.

"He has also just utilized the same data that was discussed at Mr. Blotter—Dr. Blotter's deposition and *has arrived at a conclusion as to what he believes, how he believes the accident occurred.*

"THE COURT: *And is that a conclusion that he had not reached at the time that his deposition was taken?*

"MR. HOWARD: *He didn't know any way that it could have occurred.* It could have occurred any number of ways.

"MR. FARLEY: *That's correct, Your Honor.*

"THE COURT: How does he conclude the accident occurred now?

"MR. FARLEY: Based upon what his analysis has been, the substance of his opinion is that the accident could have occurred by a striking—or a high strike on the board.

"The nail that was intended to go into the board or a second nail that, you know, after driving the nail that was intended to go and there's a bump on the edge of the board, the nail can project into the stack of lumber, and go up, and strike the plaintiff in the eye.

"That his analysis, based upon the velocity tests that he's done, which had been done previously, was that the velocity of the second nail wasn't sufficient. And even assuming all the things that the plaintiff has assumed as to how this accident occurred, that it was a second nail that got out the back of the raceway, what kind of velocity that kind of a nail would have.

"THE COURT: *What did he conclude?*

"MR. FARLEY: *That it did not have sufficient velocity in order to reach the plaintiff.*

"THE COURT: *And he didn't give this opinion at the time of the deposition?*

"MR. FARLEY: *Not that exact opinion.* But he talked about what kind of analysis he had done and what he was going to be doing in order to reach that conclusion.

"THE COURT: And when did he do this additional work from which he reached—

"MR. FARLEY: That I can't tell you. Because I don't know. Specifically time-wise, I don't know. I don't know when he did it. It may have even been as late as yesterday, for all I know.

"THE COURT: *And this is the first time that it's been disclosed that the wit-ness is going to say A, if the nail came out of the back of the gun—or if the second nail came out of the back of the gun, it wouldn't have sufficient velocity to hit the plaintiff?*

"MR. FARLEY: *That specific point, yes.* But the methodology and what he was going to be doing in that sense was discussed at his deposition.

"THE COURT: *And B, that this is the first time that the witness has given the opinion that the accident was caused by the intended nail going off in the wrong direction?*

"MR. FARLEY: That was discussed at his deposition, Your Honor, as to whether or not, given the trajectory tests that he had done in the manner that he did them, you know, whether or not a nail—and what height a nail will get to.

"And he had already done those trajectory tests at the time of his deposition. *The conclusion that he draws from that has been a conclusion that he has arrived at since that time, of which I learned for the first time last night.*

. . . .

"THE COURT: When was this deposition taken?

"MR. FARLEY: August 31st.

"MR. HOWARD: Two weeks ago.

"THE COURT: When was he hired?

"MR. FARLEY: When was he hired?

"THE COURT: Yes.

"MR. HOWARD: Two months ago.

"MR. FARLEY: About two months ago. That's about right.

"But he was made available before that. That was the only time that we could get Dr. Blotter and Ken Howard and me together to take the deposition.

"THE COURT: But it wouldn't have done any good to do it beforehand because he hadn't completed his work.

"MR. FARLEY: Yes, I understand that.

"MR. HOWARD: Your Honor, I would very much like to move this trial along. I realize that we've promised the jury they

would be out of here earlier than what they're really going to get out of here.

"And I guess I want to reserve my objection with regard to Dr. Blotter. And I don't know how else to move it along and reserve my objection, other than to make it and to see what he says.

"I'm afraid that we're going to anger this jury if we take time off for a deposition. And that's not going to help me anyway because I'd have to pass that information by somebody else.

"And if we delay for a deposition or something, I mean, I'd have to get back ahold of Dr. Adams. And I'd have to find out what he thought about the information so he could help me analyze it so I could make some head or tails of it.

"So a short recess to take his deposition is really not going to do any good. And a long one, I think, might be counterproductive.

"THE COURT: Of course I'm going on the representations that have been made at this point and not on what Dr. Blotter has actually testified to as to what he did.

"Based on what you've said, and I can— *Mr. Howard, I can understand your problem. Because it is very definitely throwing a new wrinkle into, it seems to me, throwing a new wrinkle into the case. He's presenting a completely new opinion, even though, yes, you say, Well, he warned us that he might come up with something new.*

*"But he didn't bother coming up with something new until, as I understand it, or didn't tell anybody about it until last night.*

"And it seems to me, from what I've heard at this point, that it's not because the defendant is sandbagging. And it's not because the plaintiff has failed to be diligent in pursuing its discovery.

"It seems to me that the problem is that the witness didn't get the work done because of the press of other business.

"So I don't think, from the point of view of looking at, Well, did the plaintiff—defendant fail to seasonably supplement his responses to discovery? The answer is no.

Using a double negative, no, he didn't fail to do so because he didn't know about it.

"And 26(e)(4) says that if a party fails to seasonably supplement his responses, then the court may exclude the testimony.

"So I don't think that there's a predicate for excluding the testimony at this point. If I felt that, you know, this was a sandbagging situation, I'd rule otherwise.

. . . .

"I don't think it comes within—well, I think the appropriate exercise of discretion would be to permit the testimony."

Tr., 902–13 (emphasis added).

As the above excerpt displays, the trial court inquired into and was made aware of the problem presented to the plaintiffs by the late discovery.

The standard of review applicable is that of abuse of discretion in ruling on admissibility of expert testimony. *Cosgrove v. Merrell Dow Pharmaceutical, Inc.,* 117 Idaho 470, 788 P.2d 1293 (1989); *Sidwell v. William Prym, Inc.,* 112 Idaho 76, 730 P.2d 996 (1986); *Stoddard v. Nelson,* 99 Idaho 293, 581 P.2d 339 (1978).

The trial court in this case, as set forth herein, correctly perceived the issue of admissibility of the expert testimony of both Bookwalter and Blotter, as one involving discretion. The trial court made an intensive inquiry into what tests were conducted by the witness pre and post-deposition. The trial court entertained the argument of counsel on this and related evidentiary issues.

The trial court acted within its discretion and applied the correct legal standards and clearly reached its decision by exercise of reason. *Sun Valley Shopping Center v. Idaho Power Co.,* 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991); *Braley v. Pangburn,* 118 Idaho 575, 798 P.2d 34 (1990).

Under the circumstances presented, the trial court did not abuse its discretion in refusing to exclude the expert testimony in this case.

## II.

### DID THE TRIAL COURT ERR IN GIVING THE JURY A LIMITING INSTRUCTION WITH REGARD TO THE INTRODUCTION OF DEFENDANTS' SAFETY BULLETIN, PLAINTIFFS' EXHIBIT 18

■ Exhibit 18 was a "Duo–Fast Safety Bulletin" bearing a date one year after the accident that was the subject of this litigation. Exhibit 18 was proffered by the plaintiffs to impeach the testimony of defendants' expert who had consistently testified that a "drop-off" was not a safety feature on the C–325 nailer, the instrument at issue.

Exhibit 18 did not deal with the C–325 nailer, but with three (3) other models of nailers manufactured by the defendant. Exhibit 18 read as follows:

Part Number CN–140–2 is a drop-off. It is used primarily on the C–350, KDN–75, and KDN–75L tools. Drop-offs are used for two reasons; functionally for use with short fasteners and for safety performance.

A raised drop-off permits the use of shorter fasteners. They prevent the fastener from tumbling which minimizes jamming. The chambered surface area on a drop-off will guide the point of a tumbling fastener back to its proper path down the raceway.

A drop-off can also serve as a safety feature. In these tools, the drop-off may capture a tumbling nail and prevent it from traveling in the direction of the operator.

When using nails shorter than two inches, the longer XK–1019 is recommended; nails from 2 inches to 2¼ inches should be used with a standard CN–140–2; nails longer than 2¼ inches can be used without any drop-off; and nails longer than 3½ inches must be used without a drop-off.

Because the density of the material being fastened can vary, drop-offs should also be considered with materials denser than medium grade lumber. For example; in metal piercing applications a drop-off is always recommended.

From a safety standpoint, the drop-off is not usually necessary. Consider the material density, the fastener length, and the angle of penetration. If you have any doubts about the fastener's performance, the best choice is to install a drop-off.

The defendants objected to the introduction of Exhibit 18 on the grounds that it did reflect steps taken after the date of the incident, did not deal with the C–325 nailer which was the subject of this litigation, was not relevant, and the claim of the defendants that Exhibit 18 was not admissible under Idaho Rules of Evidence 407.

The plaintiffs did not offer Exhibit 18 for introduction as evidence until the final act of their rebuttal, at which time the court admitted the exhibit for the purpose of impeaching the expert testimony of the defendants who had stated that a "drop-off" was not a safety feature in the following language:

Plaintiff's Exhibit 18 is a document that I believe the evidence will show was issued by Duo–Fast at some time after the occurrence of this accident. Any statements that are contained in this document may not be used, must not be used by you for the purpose of proving the products in issue were defective in design or manufacture or that the Defendant was negligent or otherwise at fault. The evidence in Plaintiff's Exhibit 18 may be considered by you only for the purpose of testing the believability of testimony that has been given during the trial. And that's the only purpose for which it can be used.

The trial court interpreted Exhibit 18 as an instrument that could be read to indicate remedial measures taken by the defendants one year after the injury complained of by the plaintiffs, but weighed its value as urged by the plaintiffs for the purpose of impeaching the testimony of defendants' expert and concluded it did outweigh the prejudice that might be attached to an interpretation that it consisted of a remedial measure and concluded that it could be

introduced with a limiting instruction. It is clear from the transcript of the trial that the use of a "drop-off" in connection with the C–325 nailer was never recommended until following this injury, when an engineering recommendation was made to the company that a drop-off be installed on the C–325 nailer. This recommendation was marked for purposes of identification by the plaintiffs as Exhibit 19, dated October 1988. It was never offered into evidence.

The purpose for which the trial court admitted Exhibit 18 is clear. Plaintiffs' argument for introduction was:

> What we're talking about is simply a safety bulletin which was subsequently dated, but which recognizes the use of the drop-off on the CN 325, which I think the testimony indicates was available all along.

The court ruled:

> When the witness says, It's a safe product. The accident didn't happen this way. And they've got a document in their files saying that the piece or a piece similar to the piece that was not on the product also has a purpose as a safety feature, that tends to affect the credibility of the witnesses presented by the defendant.
>
> So I'm going to let it in for that purpose. So, I think basically in reaching that decision, I'm looking at the discussion that's contained in McCormick in Section 275 and some of the cases that are cited in that area.
>
> Of course, they're talking more about Rule 407 th[a]n they are talking about our statute. But I think that basically the same line of reasoning applies.
>
> It's an area in dispute. That's one of the requirements. If they agree—if they'd have agreed with your position, then there would be nothing to dispute and then they shouldn't come in.
>
> But this is an area which is in factual dispute. There's evidence they've taken a certain position; you've taken an opposite position with respect to the products involved.
>
> So there is a factual issue in dispute. I believe this evidence, again, while it can't be used to prove culpability or a defect in design, it can be used to impeach the credibility of the defense witnesses and the opinions of the defense witnesses. . . .
>
> I don't think this is the type of document that would be unduly prejudicial, when you consider its probative value insofar as the issue of credibility is concerned.
>
> And when the document is offered— which I expect will be in the very near future—I'll give the jury a precautionary instruction.

Tr. pp. 999–1001.

The trial court, while admitting Exhibit 18 for impeachment purposes, recognized Exhibit 18 as a document that might have been interpreted as a "remedial measure" and gave a limiting instruction. We find no error.

The judgment of the trial court is affirmed.

The appellants' motion to augment the record is denied.

Costs to respondents.

BAKES, C.J., and JOHNSON, J., concur.

BAKES, Chief Justice, concurring specially:

The primary issue in this case is whether or not the district court erred in permitting an expert witness to run new or additional tests just before trial, and then to use those results to bolster or to alter his opinion. This issue could have been resolved by a Rule 16 pretrial order which set a deadline for any new testing or experiments without prior approval of the court.

As both the majority and dissenting opinions point out, Dr. Blotter in his deposition alluded to the fact that he might do some additional testing. Plaintiffs' counsel, in his statement to the court, recognized that, stating, "We continued his deposition because he had indicated at this deposition, and Mr. Farley had, that he might want to do something more." Plaintiff argues that, in the event that he did do something more, the defendant had a duty under Rule

26(e)(4) to "seasonably" supplement its discovery responses.

The drafters of Rule 26(e)(4) recognized that the term "seasonably" was somewhat imprecise.

> The committee did have some misgivings with the requirement that the party has a duty to 'seasonably' supplement his responses in that this leaves a great deal of discretion to the trial court in determining whether the supplementation was done within the time required. However, it appeared that no better term could be devised....

Comment to I.R.C.P. 26(e).

In *Radmer v. Ford Motor Co.*, 120 Idaho 86, 813 P.2d 897 (1991), this Court, in analyzing the Rule 26(e)(4) requirement, quoted from Friedenthal, *Discovery and Use of an Adverse Party's Expert Information*, 14 Stan.L.Rev. 455, 485 (1962), that it is "fundamental that *opportunity be had for full cross-examination....*" *Radmer*, 120 Idaho at 89, 813 P.2d at 900 (emphasis added). Thus, an important inquiry in determining whether a response was given "seasonably" is: was the opposing party given an opportunity for full cross examination? If "yes," then there probably would be no abuse of discretion in admitting the testimony.

In his original testing, Dr. Blotter had tested a similar nail gun to evaluate the plaintiffs' claim that a nail was able to get into a position where it could come out of the back of the raceway on the nail gun with sufficient velocity to reach the plaintiff and injure his eye. The later testing by Blotter was to determine the force required by the nailer in order to drive a nail into wood. After doing the additional tests, Dr. Blotter's new opinion was, as noted in the dissenting opinion, that the most likely scenario for the accident was that the operator of the nail gun simply missed the board with the nail, and it hit the plaintiff in the eye, a rather non-technical and somewhat obvious conclusion. Had the additional testing and Dr. Blotter's new opinion been a very technical analysis and conclusion as to how the accident occurred, the trial court, or this Court on appeal, may well have concluded that the plaintiffs had been deprived of the opportunity for full cross examination. *Cf. Radmer, supra.* The trial judge, who presided over the entire proceeding including all of the pretrial discovery disputes that occurred between the parties, concluded that the plaintiff was not prejudiced by the late disclosure, and that the defense expert ought to be permitted to use the additional testing in arriving at his opinion.

The issue which we must resolve is whether or not the trial court abused its discretion in permitting the expert Dr. Blotter to consider his last minute force tests and then render an opinion that the most likely cause of the accident was that the operator simply missed the board with the nail. Unless we are convinced that the trial court erred in the exercise of its discretion, we should affirm. While it is a close question, the facts of this case are sufficiently distinguishable from *Radmer v. Ford Motor Co.*, 120 Idaho 86, 813 P.2d 897 (1991), to justify not overturning the trial court's exercise of discretion in this case.

BISTLINE, Justice, dissenting from the majority opinion, and concurring in the opinion of Justice TROUT:

On March 3, 1992, the Court was then comprised of five sitting justices, all of whom participated in the opinions issued in the above-captioned case, *Hopkins v. Duo–Fast.* Justice McDevitt authored the opinion for the Court, and that opinion was joined only by Chief Justice Bakes and Justice Johnson. Justices Bistline and Boyle both dissented and wrote separate opinions. Justice Bistline, in addition to his own expressed views, fully joined the opinion of Justice Boyle. Justice Boyle has since accepted a position in the federal judiciary and therefore is no longer participating.

In June of 1992, the Hopkins' petition for rehearing was granted. On September 15, 1992, the Court heard the reargument of the parties, and the controversy was taken under consideration, which so continues. The order granting a rehearing was just

that, and nothing more. Such an order does not displace the opinions which had been written and culminated in the opinion for the Court, a point to be kept in mind. When a new opinion emanates from the Court, which is a majority opinion, as history evidences, it supplants the previous majority opinion, and on issuance this Court ordinarily states in plain language that any earlier contrary opinion is withdrawn, hence *functus officio*. Portions thereof may surface in the substituted opinions.

Having made that clear, and because of my having joined the previous dissenting opinion authored by Justice Boyle, I now adopt as my own the views therein expressed and attach that joint opinion hereto as Appendix A. In addition, I stand fast on the views which I expressed for myself in my 1992 opinion, which are reiterated herein.

Particular attention should be given to where the district court, the Hon. George D. Carey, Fourth Judicial District, begins the discussion leading to his disposition of the issue concerning the failure of Duo–Fast to supplement its answers to interrogatories:

> *Mr. Howard, I can understand your problem. Because it is very definitely throwing a new wrinkle into, it seems to me, throwing a new wrinkle into the case. He's presenting a completely new opinion, even though, yes, you say, Well, he warned us that he might come up with something new.*
>
> *But he didn't bother coming up with something new until, as I understand it, or didn't tell anybody about it until last night.*

And it seems to me, from what I've heard at this point, that it's not because the defendant is sandbagging. And it's not because the plaintiff has failed to be diligent in pursuing its discovery.

*It seems to me that the problem is that the witness didn't get the work done because of the press of other business.*

So I don't think, from the point of view of looking at, well, did the plaintiff—defendant fail to seasonably supplement his responses to discovery? The answer is no. Using a double negative, no, he didn't fail to do so because he didn't know about it.[2]

And 26(e)(4) says that if a party fails to seasonably supplement his responses, then the court may exclude the testimony.

So I don't think that there's a predicate for excluding the testimony at this point. If I felt that, you know, this was a sandbagging situation, I'd rule otherwise.

But I think, at least from what I've heard, that Dr. Blotter would testify to as to the reasons why he hadn't reached that conclusion beforehand.[3]

I don't think it comes within—well, I think the appropriate exercise of discretion would be to permit the testimony.[4]

R. 912–13 (emphasis added).

The trial court was obviously keenly aware of the problem presented by the late discovery but nevertheless ruled against the plaintiffs, who were judicially found to have been diligent in pursuing discovery. Instead, the court favored the tardy defendants. The court showed no consideration of the proposition that the defendant and

**2.** In this passage, Judge Carey apparently uses "defendant" as applicable to the corporation Duo–Fast. Duo–Fast appeared before the trial court by and through its retained attorney, Donald J. Farley. It is unclear as to who is the "he." The person in charge of the Duo–Fast defense was Mr. Farley.

**3.** Here the reader is presented with the supposed basis for Judge Carey's decision, his conclusion exonerating Duo–Fast's witness, Dr. Blotter, and hence Duo–Fast as well, for not having timely completed the testing which they were to do, and then to timely advise the Hopkins' attorney. Unacceptable is the statement

by Judge Carey that "from what I've heard, Dr. Blotter would testify as to the reasons why he hadn't reached that conclusion beforehand." It was a bare conclusion which the record does not support, and hence unsupportable.

**4.** Wholly incomprehensible and unavailable is the means by which Judge Carey arrived at this conclusion. As matters stand, the statement is a conclusion without any substantiation. Trial courts are granted discretion, true, but the parties are entitled to be informed as to the manner and reasoning which enters into the exercise of that discretion. Otherwise, pandemonium may rule.

its counsel were under an implied obligation of fairness which required that Dr. Blotter's further testing, beyond that which had been conducted prior to the taking of his deposition, be both finished and furnished at least far enough in advance of trial so as to allow plaintiffs' counsel time to consider it and prepare plaintiffs' expert to make a response. Instead the district court attributed "the problem" wholly to Dr. Blotter's failure "to get the work done because of the press of other business." Nothing in the court rules or in the record supports the court in its ruling that Dr. Blotter's lateness in conducting further testing and reaching new conclusions was excusable "because of the press of other business," which is pure conjecture. Instead, the court should have placed the onus where it properly belonged, on Duo–Fast and its counsel, for not riding herd on Dr. Blotter. Duo–Fast, however, did not spring its surprise until after plaintiffs had presented their case. Defense counsel in making the belated disclosure to the court and counsel expressed no remorse for having been so remiss in his duties.

It simply is not possible to understand how the Chief Justice less than two years ago in the case of *Radmer v. Ford Motor Co.*, 120 Idaho 86, 813 P.2d 897 (1991), could write the following *ratio decidendi* and then join the opinion of Justice McDevitt, which ignores *Radmer* as though it never existed. *Radmer* states, in pertinent part:

> The issue in this case is governed by Rule 26(e) of the Idaho Rules of Civil Procedure. That rule provides in pertinent part:
>
> (1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to ... (B) the identity of each person expected to be called as a witness at trial and *with regard to expert witnesses the subject matter on which he is expected to testify, and the substance of his testimony.*
>
> This rule unambiguously imposes a continuing duty to supplement responses to discovery with respect to the substance and subject matter of an expert's

testimony where the initial responses have been rejected, modified, expanded upon, or otherwise altered in some manner. *Zolber v. Winters*, 109 Idaho 824, 712 P.2d 525 (1986); *Wright and Miller, Federal Practice and Procedure, Supplementation of Responses* § 2048.

In general, Rule 26 of the Idaho rules, like its federal analogue, *was designed to promote candor and fairness in the pre-trial discovery process.* Speaking with reference to Rule 26(b)(4)(A)(i) of the federal rules, the Advisory Committee on Civil Rules which promulgated the original draft of Rule 26 stated:

> In cases of this character [involving expert testimony], a prohibition against discovery of information held by expert witnesses produces in acute form the very evils that discovery has been created to prevent. Effective cross-examination of an expert witness requires advance preparation.... Similarly, effective rebuttal advances knowledge of the line of testimony of the other side. If the latter is foreclosed by a rule against discovery, the narrowing of issues and elimination of surprise which discovery normally produces are frustrated.

Advisory Committee Notes, rule 26, Fed. Rules Civ.Proc., 28 U.S.C.A. Further illustrating the critical nature of complete and accurate responses regarding expert witnesses in the discovery process, one scholar notes:

> It is fundamental that opportunity be had for full cross-examination, and this cannot be done properly in many cases without resort to pretrial discovery, particularly when expert witnesses are involved.... Before an attorney can even hope to deal on cross-examination with an unfavorable expert opinion he must have some idea of the bases of that opinion and the data relied upon. If the attorney is required to await examination at trial to get this information, he often will have too little time to recognize and expose vulnerable spots in the testimony.

Friedenthal, *Discovery and Use of an Adverse Party's Expert Information*, 14 Stan.L.Rev. 455, 485 (1962).

Typically, failure to meet the requirements of Rule 26 results in exclusion of the proffered evidence. *Coleco Industries, Inc. v. Berman*, 567 F.2d 569 (3d Cir.1977). Moreover, while trial courts are given broad discretion in ruling on pretrial discovery matters, reversible error has been found in allowing testimony where Rule 26 has not been complied with. *Smith v. Ford Motor Co.*, 626 F.2d 784 (10th Cir.1980).

*Radmer*, 120 Idaho at 89, 813 P.2d at 900 (footnote omitted) (emphasis added) (Bakes, C.J. author, Bistline, Johnson, Boyle, and McDevitt, JJ., concurring). This strange affair is made even more incredible because Justice McDevitt was a sitting member of a unanimous Court which issued *Radmer*.

All of which is to suggest that while there are times when the Court functions as a unit, there are other times, such as now, where the trial bench and bar, and not to the exclusion of the general public, may well conclude that the Court is more interested in sending out opinions than in making that extra effort to release opinions which are soundly thought out and premised on at least on some reasonable degree of consistency, preferably always striving for a result which has an aroma of justice.

### APPENDIX A

BOYLE, Justice, dissenting.

In my view, defendants had a duty to supplement their experts' deposition responses prior to trial as required by *Radmer v. Ford Motor Co.*, 120 Idaho 86, 813 P.2d 897 (1991). Accordingly, I respectfully dissent.

. . . .

I also respectfully dissent from that portion of the majority opinion which holds that counsel for plaintiff waived a continuance during trial to take the deposition of defendant's expert. In my view, the trial court was not excused from excluding undisclosed evidence of additional tests and analysis performed after the expert's pretrial discovery deposition had been taken.

A review of the record clearly confirms that the trial court offered plaintiffs a recess to take further depositions of the defense expert. Although this was a reasonable proposal by the trial court, in light of its rejection by the surprised party it is not a sufficient remedy to overcome the prejudice to plaintiffs in this instant case. Perhaps more importantly, the majority's approval of the trial court's proposal to allow a deposition does not provide any meaningful guidance to the bench and trial bar in future cases. If any of the litigants is to bear the burden, responsibility or prejudice of failing to supplement discovery, it should be the offending party rather than the surprised party. In my view, our approval today of allowing a continuance during trial when a party fails to supplement its discovery responses will encourage eleventh hour undisclosed discovery rather than prevent it as is contemplated by the Rules of Civil Procedure.

To place a surprised party in the position of having to accept the alternative of bringing the trial to a halt, taking the delinquent expert's deposition and then provide that information to the other experts and, finally, in all likelihood, take additional depositions in response all because of a party's failure to supplement an expert's opinion is an unacceptable and unjust remedy. Such a procedure can only work to the offending party's advantage and should not be allowed by the trial court nor approved by us on appeal. In my view, the only fair method of preventing the problem of a party failing to supplement discovery is to exclude evidence of post-discovery testing by experts or other new evidence obtained after the close of discovery unless a timely supplement is made as contemplated by the Rules. *Radmer v. Ford Motor Co.*, 120 Idaho 86, 813 P.2d 897 (1991). *See* I.R.C.P. 26(e)(4) which clearly provides:

(4) If a party fails to seasonably supplement his responses as required in this Rule 26(e), the trial court may exclude the testimony of witnesses or the admission of evidence not disclosed by a re-

quired supplementation of the responses of the party.

Rule 26 and all of its sub-parts are controlled by the provisions of Rule 1(a) which require that "[t]hese rules shall be liberally construed to secure the just, speedy and inexpensive determination of every action and proceeding." In my view, none of these criteria have been satisfied by the process approved herein.

For the foregoing reasons, I respectfully dissent.

BISTLINE, J., concurs.

TROUT, Justice, dissenting.

After much thought about the expert testimony presented in this case and the importance of judicial discretion in ruling on the admission of testimony at trial, I must respectfully dissent from the majority opinion on rehearing.

The defendants' expert, Dr. Blotter, testified at his deposition that he could not say what was the most likely cause of plaintiff's injury. Dr. Blotter stated "it seems unlikely that the nail came from the subject gun so I don't know for sure how it [the injury] happened." Deposition of Dr. Blotter, p. 76 (taken August 31, 1989). Dr. Blotter further speculated that the injury could have been caused by "ricochets from guns in other locations" or that injury was caused by something other than a nail such as a staple or some other metal object. *Id.* at 73. At trial, however, after informing defendants' counsel that he had conducted additional testing after his deposition, Dr. Blotter testified that based upon this additional testing, he had changed his opinion and now concluded that the subject nail gun had in fact fired the nail which injured the plaintiff. Dr. Blotter opined that "the most likely scenario" is that the operator of the subject nail gun "simply missed the board with the nail" which thereafter struck the plaintiff.

It is difficult for me to imagine a case where plaintiffs' counsel could have been more circumspect in assuring himself that no new testimony would be forthcoming from the defendants' expert after the expert's deposition was concluded. The excerpt from the Blotter deposition set forth in the majority opinion makes clear that plaintiffs' counsel wanted to know if Dr. Blotter anticipated doing any further work in advance of trial. Additionally, plaintiffs' counsel made it unmistakably clear at the Blotter deposition, taken just two weeks before trial, that the plaintiff needed sufficient opportunity to respond to additional tests performed by Blotter:

> Mr. Howard: If you are going to have him do that additional stuff [testing], then I will want to continue this deposition. I am even taking a position quite frankly I may ask the Court to disallow him to testify unless I am afforded sufficient opportunity to discover and respond to any additional tests. This is beyond the 11th hour. We don't need to argue that now, I just want you to know that.

In response, defendants' counsel gives his assurance that plaintiffs' counsel would be given access to any additional tests:

> Mr. Farley: I understand your position. My position is that you will be given full and free access to whatever other information other than what has been testified to today may come up.
>
> Mr. Howard: When?
>
> Mr. Farley: Just as soon as I know it. If it is Tuesday, then you will have access to it. If it is the weekend before he testifies, you will have access to it. Just whenever. You will be given the opportunity to take his deposition if you want to do that or if you want to sit down and talk to him about anything additional I will give you that opportunity as well.

Deposition of Dr. Blotter, pp. 90–91.

Notwithstanding the moral duty imposed on defendants' counsel as a result of the above representations, I.R.C.P. 26(e)(1) statutorily obligates counsel to supplement responses to discovery, in particular the substance of an expert's testimony:

> [A] party is under a duty seasonably to supplement his response with respect to *any* question directly addressed to (A) the identity and location of persons having knowledge of discoverable matters,

and (B) the identity of each person expected to be called as a witness at trial *and with regard to expert witnesses the subject matter on which he is expected to testify, and the substance of his testimony.*

I.R.C.P. 26(e)(1). (Emphasis added.)

In *Radmer v. Ford Motor Co.*, 120 Idaho 86, 813 P.2d 897 (1991), we recognized the importance and purpose of I.R.C.P. 26(e)(1) in promoting candor and fairness in the pre-trial discovery process when expert witnesses are involved:

> It is fundamental that opportunity be had for full cross-examination, and this cannot be done properly in many cases without resort to pretrial discovery, particularly when expert witnesses are involved ... Before an attorney can even hope to deal on cross-examination with an unfavorable expert opinion he must have some idea of the bases of that opinion and the data relied upon. If the attorney is required to await examination at trial to get this information, he often will have too little time to recognize and expose vulnerable spots in the testimony.

120 Idaho at 89, 813 P.2d at 900 *citing* Friedenthal, *Discovery and Use of an Adverse Party's Expert Information,* 14 Stan.L.Rev. 455, 485 (1962).

Defendants' counsel in the present case was under a statutory duty to notify plaintiffs' counsel "seasonably" that the substance of Dr. Blotter's testimony had changed, i.e. he had conducted further tests and was now able to conclude that the plaintiff's injury was caused by a nail from the subject nail gun after the operator missed a board.

Defendants' counsel apparently takes the position that he did supplement the response by advising plaintiffs' counsel of the additional testing shortly before his expert was to take the stand and *after plaintiffs' counsel specifically asked if there was any additional work that has been done by Dr. Blotter.* Defense counsel's explanation for this late disclosure was that "[I] learned last night that he [Dr. Blotter] has, in essence, done some force tests by going down into his lab." Thus, because defense counsel did not require his expert to conduct his tests and reach his conclusions prior to the deposition, and because he didn't bother to ask his expert until the night before his testimony at trial, we are asked to accept that he has seasonably supplemented his discovery responses and the expert testimony should be allowed.

At the time this disclosure was made, plaintiffs' counsel had already rested and his expert witness had left. Plaintiffs' counsel was placed in the position of being right in the middle of a trial, with a jury which had apparently been promised that the trial would be over soon, and only then finding out that his assumptions about defendants' expert witness' testimony were in error. He was in no position at that point to conduct further discovery or bring his expert witness back to the trial.

The term "seasonably" as used in Rule 26(e) must have a reasonable meaning to assure members of the bar that some degree of consistent fairness exists in the rules of procedure. "Seasonably" cannot possibly mean moments before the witness is to testify and it must place some requirement on counsel that they ask their witnesses to set aside the "press of business" in order to prepare early and fully. Offering opposing counsel a few minutes to speak with the witness, a continuance, or even the cost of another deposition cannot possibly compensate opposing counsel for all of the expense and time which goes into trial preparation. Rule 26(e)(4) gives the court both the authority and the responsibility to exclude the testimony not seasonably disclosed, which places the penalty on the party who did not supplement, where it properly belongs. To hold otherwise encourages a lack of diligence on the part of counsel, realizing that their last minute trial preparation and consultation with their expert witnesses will place opposing counsel at an extreme disadvantage.

I am very familiar with our standards on the exercise of judicial discretion set forth in *Sun Valley Shopping Center v. Idaho Power Co.,* 119 Idaho 87, 803 P.2d 993 (1991), and I have considered carefully the

comments of the trial judge in exercising his discretion to permit this testimony. While I believe strongly in the importance of vesting the trial courts with the discretion to make these very difficult decisions, I cannot in good conscience affirm the exercise of discretion in this instance. In my opinion, it was manifest error for the trial court to allow Dr. Blotter to testify at trial concerning his recently formulated opinion on the most critical element of plaintiffs' case, the cause of the injury. To hold otherwise sends a message to the trial bar of this state that they can permit their witnesses to change their testimony at the last minute with impunity. I do not understand that to be the intent behind our rules of discovery. For that reason I respectfully dissent from the majority opinion.

BISTLINE, J., concurs.